IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN GUARANTEE & LIABILITY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff/Counterclaim-Defendant, | ) ) | |
| v. | ) ) | Case No. 4:06-CV-00655-RWS |
| UNITED STATES FIDELITY & GUARANTY COMPANY, | ) ) ) | CONSOLIDATED |
| Defendant/Counterclaim-Plaintiff, | ) ) ) | |
| and | ) ) | |
| TIG INSURANCE COMPANY, | ) ) | |
| Defendant. | ) ) | |

**PLAINTIFF'S SUPPLEMENTAL BRIEF REGARDING BANKRUPTCY ISSUES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**BACKGROUND**

Plaintiff American Guarantee & Liability Insurance Company ("Zurich") submits this supplemental brief in opposition to defendants' motion for summary judgment pursuant to the Court's Order entered November 16, 2009 (Doc. No. 206), to address the bankruptcy-related issues outlined in the Order.

As a threshold matter, we note that while it is accurate to say the CF Trust elected not to make a *written* demand that defendants settle the Silva case, the undisputed facts do not establish that there was never any type of request for settlement on the part of the CF Trust.[1] To the contrary, there is evidence in the record that CF Trust representatives orally requested that TIG

---

[1] In their motion papers, defendants do not maintain that the CF Trust never made any sort of request or demand to TIG that the Silva case be settled. Rather, they assert only that the CF Trust rejected Brad Baumgart's request that it send a hammer letter to TIG. *See* Defendants' Revised Statement of Uncontroverted Material Facts ("Defendants' SUMF") at ¶¶ 157-161.

settle the Silva case, and that based on their discussions with TIG representatives, they hoped and expected that the case would be settled. *See* Zurich's Statement of Additional Material Facts ("Zurich's SAMF") at ¶¶ 227-257.

We point, first, to evidence that Brad Baumgart discussed with Kim Mingo his understanding of the status of settlement negotiations, and Mingo indicated that the CF Trust had requested that TIG settle the case. Zurich's SAMF at ¶ 240. When Mingo told Baumgart that the request had not been made in writing, he suggested she might want to make a written request. Mingo responded that she didn't think it was necessary to put the request in writing, especially since the CF Trust's lawyer was on the phone when the request had been made. *Id.*

Second, Tammy Burris testified to talking with Kerry Morgan about Baumgart's suggestion that the CF Trust put its request in writing that TIG make a good faith effort to settle the Silva case. *Id.* at ¶ 243. She said they decided not to do so because they understood that settlement negotiations were already going on, "[s]o demanding that they do so is demanding what we're already doing, so we didn't do it." *Id.* Such a request, therefore, would have been an unnecessary act. *Id.*

Standing alone, Baumgart's and Burris's testimony establishes that there was an oral request on the part of the CF Trust that TIG settle the Silva case, or, at the very least, that there are genuine issues of material fact concerning the settlement demand issue. In either case, defendants are not entitled to summary judgment on this issue.

Having clarified the factual record, we address below the point that, in any event, the CF Trust's making, or not making, a demand that defendants settle the Silva case is of no legal significance in this case. Because the Silva plaintiffs' recovery was limited to insurance proceeds, the CF Trust had no financial stake in whether the Silva case was settled, or for how much. Indeed, Kerry Morgan, the trustee of the CF Trust, recognized that fact and that

433048.5

settlement was TIG's "decision to make."[2] Zurich's SAMF at ¶¶ 227-228. As also discussed below, in light of the foregoing facts, coupled with pertinent provisions of bankruptcy law and Missouri law, the CF Trust was not vested with the legal power to make a demand that defendants settle the Silva case.

## ARGUMENT

### I. THE PRESENT CAUSE OF ACTION FOR BAD FAITH FAILURE TO SETTLE ACCRUED IN MARCH 2006, LONG AFTER CF ENTERED BANKRUPTCY, AND THE CF TRUST HAD NO INTEREST IN THE CLAIM.

Under Missouri law, a claim for bad faith refusal to settle accrues when the excess judgment is entered. *See* Mo. Rev. Stat. § 516.100 (action accrues when damage is sustained and capable of ascertainment); *Amoco Oil Co. v. Reliance Ins. Co.*, 1998 WL 187336 at *4-5 (W.D. Mo. 1998) (cause of action for bad faith failure to settle accrues when a policyholder is legally obligated to pay an excess judgment). *See also Carpenter v. Automobile Club Insurance Interinsurance Exchange*, 58 F.3d 1296, 1301 (8th Cir. 1995) (applying Arkansas law). The jury returned a $46 million verdict in the Silva case on March 2, 2006, and the court entered judgment on the verdict on March 7, 2006. Defendants' Summary Judgment Exhibit 45.

Also, the gravamen of Zurich's claims is that defendants wrongfully refused to avail themselves of opportunities to settle the Silva claims within the primary policy limits; and those opportunities presented themselves in December 2005, when the Silva plaintiffs made a settlement demand for $5 million, and again on the first day of trial, in February 2006, when the Silva plaintiffs reduced their settlement demand to $4.75 million. Zurich's SAMF at ¶¶ 87-91, 143-147.

---

[2] It is undisputed that, even though the CF Trust was not involved in settlement negotiations and was never made aware of how much money TIG was willing to pay to settle the Silva case, Kerry Morgan, Kim Mingo and Tammy Burris all "wanted" the Silva case to be settled, and "hoped" that it would be settled. Zurich's SAMF at ¶¶ 229-230.

433048.5

Zurich's bad faith failure to settle claims therefore accrued on March 7, 2006 – long after CF filed for bankruptcy (September 3, 2002). Under 11 U.S.C. § 541(a)(1), CF's bankruptcy estate was comprised of various "legal or equitable interests of the debtor in property as of the commencement of the case." As of the commencement date of CF's bankruptcy case (September 3, 2002), Zurich's bad faith claims had not yet accrued. Accordingly, they cannot be deemed part of the CF bankruptcy estate.

Similarly, Zurich's bad faith claims also accrued subsequent to the date on which CF's Consolidated Plan of Liquidation ("Plan") was confirmed (November 22, 2004); the Effective Date of the Plan, when the CF Trust was established and took title to the assets of CF's bankruptcy estate (December 13, 2004); and the date on which CF was dissolved (December 31, 2004).[3] Accordingly, Zurich's bad faith claims do not fall within the Plan definition of Trust Property and did not become part of the CF Trust. Under bankruptcy law, where, as here, assets in which the debtor may have an interest come into existence after the effective date of the Plan, they are not part of the bankruptcy estate or a liquidating trust such as the CF Trust, unless the Plan provides otherwise, which is not the case here. *See* 11 U.S.C. § 1141(b); *In re Linsenmeyer*, 2003 WL 22734652, *2 (6th Cir. 2003); Zurich Summary Judgment Exhibit 49 (Consolidated Plan of Liquidation) at §§ 1.2.109 and 7.1.[4]

We note that the question of whether the CF Trust ever held an interest in the bad faith claims asserted here, or otherwise was vested with the power to demand that defendants settle the

---

[3] As to the date of CF's dissolution, *see* Zurich's SAMF ¶ 30. As to the other dates referenced above, *see In re Consolidated Freightways Corporation of Delaware*, No. RS 02-24284 PC (Bankr. C.D. Cal.) (hereafter "CF Bankruptcy Case"), Docket Entry No. 7574 (Stipulation Between the Trustee, on Behalf of the CF Trust and the Debtors, and United States Fidelity & Guaranty Company Regarding Allowance of Administrative Expense Claim, dated December 6, 2006).

[4] Such later-arising assets may instead revert to the debtor. Under the law of Delaware – the state of CF's incorporation – a dissolved corporation may retain title to assets and the ability to prosecute claims for three years following its dissolution. 8 Del.C. § 278.

Silva claims, is not controlled by whether the USF&G Policy became part of the bankruptcy estate or subsequently was transferred to the CF Trust. Under Missouri law, a claim for bad faith refusal to settle arises from common law duties, as recognized by the Missouri Supreme Court in *Zumwalt v. Utilities Ins. Co.*, 228 S.W.2d 750 (Mo. 1950). *See, e.g., Shobe v. Kelly*, 279 S.W.3d 203, 210 (Mo. App. W.D. 2009). The claim does not spring from the policy itself. Indeed, the policy provides that the insurer, not the insured, has the right to control settlement. Defendants' Summary Judgment Exhibit 92 at 15. Under Missouri law, a claim for bad faith refusal to settle sounds in tort; it is not a contract claim for breach of the insurance policy. *See, e.g., Dyer v. General American Life Ins. Co.*, 541 S.W.2d 702, 704 (Mo. App. 1976).

Further, even assuming *arguendo* that the CF Trust ever acquired some right or interest relating to settlement of the Silva case – for example, on the premise asserted by defendants, that such right is deemed embodied in the policy, which automatically devolved to CF's bankruptcy estate, without express assumption, as an alleged non-executory contract[5]– the CF Trust still

---

[5] If the policy is deemed executory, it would not become part of the bankruptcy estate or the CF Trust unless the bankruptcy trustee expressly assumed it, which indisputably did not happen here. *See* 11 U.S.C. § 365(a). However, defendants argue that the policy should not be deemed executory and, on that basis, that it become part of the bankruptcy estate and later the CF Trust by operation of law. In making any determination of whether the policy was an executory contract, the policy and the Indemnity Agreement should be considered together, as if they were a single agreement, since they were executed at the same time, as part of a single transaction. *See, e.g., Boulds v. Chase Auto Finance Corp.*, 266 S.W.3d 847, 851 (Mo. App. 2008). An agreement is to be considered executory if the obligations of both the bankrupt and the other party are so far unperformed that the failure of either to complete performance would constitute a material breach of the contract, excusing the performance of the other. *See, e.g., In re Knutson*, 563 F.2d 916, 917 (8th Cir. 1977). To the extent that whether the USF&G Policy and the Indemnity Agreement are considered executory is deemed to have any legal significance for purposes of this case, we submit that the agreements should be deemed executory. The policy was still in force as of the bankruptcy case commencement date and did not expire until October 1, 2002. *See* Defendants' SUMF at ¶ 21. As of the commencement date, there was substantial performance remaining from both CF and USF&G – CF to deliver the collateral to USF&G and USF&G to administer and pay claims made against CF, among other things. *See* Zurich's SAMF at ¶ 21; Defendants' SUMF at ¶ 43. USF&G has effectively admitted that there was

should not be deemed to have been vested with the power to make a settlement demand. As discussed in part III, *infra*, the CF Trust had no financial stake in whether the Silva case was settled, or for how much. Any power to make a settlement demand thus would be exercised for the benefit of third parties, not the CF Trust itself. A bankruptcy estate does not include "any power that the debtor may exercise solely for the benefit of an entity other than the debtor." 11 U.S.C. § 541(b)(1).

Put another way, since any judgment in favor of the Silva plaintiffs only could be enforced against insurance proceeds, it was at all times clear that any potential bad faith claim could only implicate Zurich's interests, as CF's excess insurer. Thus, any conceivable interest that CF, its bankruptcy estate or the CF Trust could have in the matter would be subrogated to the interests of Zurich – the only party potentially liable to pay any excess judgment. 11 U.S.C. § 541(d) provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

Even in cases where a debtor's insurance policy is deemed property of the bankruptcy estate, it has been held that when policy proceeds are subject to the subrogation rights of another party, the policy proceeds are excluded from the property of the bankruptcy estate. *See In re Hiatt*, 2000 WL 33712218, *5 (Bankr. Idaho 2000); *In re Air South Airlines, Inc.*, 1999 WL 33486098 at *4-5 (Bankr. D.S.C. 1999).

---

substantial performance remaining under the Indemnity Agreement and policy in that it filed an administrative claim for expenses resulting from its post-petition claims handling. *See* Zurich's SAMF at ¶ 261. In any event, for the reasons discussed above, whether the agreements were executory is not dispositive of any issue arising in the present case and the Court, accordingly, need not resolve any such issue.

6

433048.5

In sum, Zurich's bad faith claims accrued long after CF entered bankruptcy and the estate assets vested in the CF Trust. For the foregoing reasons, the CF Trust never acquired any interest in Zurich's bad faith claims.

## II. THE BAD FAITH FAILURE TO SETTLE CAUSE OF ACTION DID NOT BECOME PART OF CF'S BANKRUPTCY ESTATE OR THE CF TRUST.

The second question the Court asks the parties to address is whether the bad faith failure to settle cause of action became part of the bankruptcy estate; and, if so, when and by what mechanism? For the reasons discussed in part I above, the bad faith failure to settle cause of action never became part of CF's bankruptcy estate or the CF Trust.

## III. THE BANKRUPTCY COURT'S DECISION TO LIFT THE AUTOMATIC STAY AND LIMIT RECOVERY TO THE APPLICABLE INSURANCE POLICIES MEANT THAT NEITHER THE CF BANKRUPTCY ESTATE NOR THE CF TRUST HAD AN ECONOMIC STAKE IN WHETHER THE SILVA CASE WAS SETTLED, OR FOR HOW MUCH, AND THEREBY OBVIATED ANY NEED FOR A SETTLEMENT DEMAND TO HAVE BEEN MADE.

As noted above, the bankruptcy court in the CF bankruptcy proceedings granted the Silva plaintiffs relief from the bankruptcy stay, but provided that any recovery may come only from available insurance proceeds. This limitation on the assets against which the Silva plaintiffs could recover eliminated CF, its bankruptcy estate or the CF Trust from having any stake in the outcome of the Silva action. Thus, only CF's insurers were at risk; and, in particular, only Zurich was at risk for a judgment in excess of the primary policy limits.

Indeed, that was how the CF Trust perceived matters during the time period in which the significant events played out. The CF Trust had no involvement in settlement discussions or negotiations in the Silva case. It was understood that TIG was "handling the case, managing the case, responsible for ... settling the case.... It was their case to resolve." Zurich's SAMF at ¶ 227. The CF Trust's view of the Silva claims was that "like all of the claims that they had, it was their claim to settle and we were a resource." *Id.*

7

Notwithstanding the above, defendants seek to undertake a *post hoc* rewriting of history and argue that – although none of the key actors so recognized at the time, or made decisions or took actions on that basis – the CF Trust in fact did have a financial stake in whether or how the Silva case was resolved. Defendants argue that (1) the CF Trust had a potential reversionary interest in the $87 million collateral of which USF&G gained control following CF's bankruptcy filing, to the extent the collateral was not completely utilized to reimburse USF&G for claim payouts; and (2) the CF Trust had potential exposure as an unsecured creditor, under the Indemnity Agreement, if claim payouts under the USF&G Policy exceeded the amount of the collateral. These arguments are defective in multiple respects.

As a starting point, the entire premise of defendants' argument rests on equating the CF Trust with a private party not in bankruptcy, who, after satisfying claims out of the assets in its possession, will be able to retain the remaining assets and utilize them for its own purposes. But the analogy is not apt.

CF was insolvent and the subject of liquidation proceedings. The CF Trust's mission was to see to it that the remaining assets of CF were collected, and were distributed among CF's creditors fairly and in the manner required by applicable law. Zurich Summary Judgment Exhibit 49 (Consolidated Plan of Liquidation) at 42-43. It was at all times clear that CF's liabilities outstripped its assets, CF's unsecured creditors would at most recover some percentage of their claims, and there would be nothing left over for CF or its shareholders. That being the case, the CF Trust never was in a position of trying to preserve assets for itself or the debtor. Rather, the CF Trust was focused solely on distributing all remaining assets to CF's creditors, which included the Silva plaintiffs and USF&G, to the extent the latter had a claim under the Indemnity Agreement.

433048.5

The CF Trust had no charge to promote the interests of any one creditor over another. Accordingly, the CF Trust had no proper interest in whether the Silva plaintiffs wound up with more, or less, in respect of their claims, so long as what they received was in accordance with the applicable law and the Plan. Similarly, the CF Trust had no interest in how much, if anything, USF&G ultimately recovered in respect of any claims it had under the Indemnity Agreement.

In the same vein, even to the extent that the amount of a claim payout to the Silva plaintiffs influenced whether there would be any excess left over from the $87 million collateral posted to secure the Indemnity Agreement – which, as discussed below, was not the case – the interests of the CF Trust would not be implicated. At the end of the day, the CF Trust had no proper concern over which creditors might receive more or less money – USF&G, or the remaining unsecured creditors. The CF Trust had no interest in whether collateral reverted to the Trust, and thereby became available for pro rata payments to unsecured creditors, or, rather, the entire amount of the collateral was consumed by reimbursements to USF&G under the Indemnity Agreement, for amounts paid out under the policy to satisfy claims against CF.

Moreover, there is no factual basis for defendants' position that the CF Trust had a possible reversionary interest in the collateral posted to secure the Indemnity Agreement. For one thing, it was clear there would be no collateral left over. The collateral aggregated $87 million, whereas USF&G provided the CF Trust with loss runs showing approximately $110 million in claims made against the policies, and filed a proof of claim for approximately $115 million. *See* Plaintiff's SAMF at ¶¶ 259, 262.[6]

---

[6] Further, part of the collateral was $25 million in funds paid by a surety, which posted a bond as part of the security provided in connection with the Indemnity Agreement. Accordingly, any excess collateral in respect of the bond would revert back to the surety, not to CF or the CF Trust. *See* Memorandum in Support of Plaintiff's Motion for Leave to File Surreply or, in the

Similarly, the impact of any settlement in the Silva case upon the amount of any potential unsecured claim of USF&G under the Indemnity Agreement, or the relationship of that claim to the claims of other unsecured creditors, would have been *de minimis*, at best. When the Plan was confirmed, several billion dollars in unsecured claims were filed, and it was evident that there would only be fractional payments to the unsecured creditors.[7] Thus, insofar as any unsecured claim of USF&G may have been a few million dollars larger or smaller in respect of what happened on the Silva claims, the corresponding effect upon the fractional payments to be made to other unsecured creditors would have been insignificant.

In sum, the CF Trust had zero incentive to (1) analyze the impact of settlement or an excess judgment on distributions to CF's creditors; (2) consider whether under the Plan it even had the right or authority to involve itself in settlement decisions; or (3) attempt to get involved with settlement of the Silva claims, which it considered to fall within TIG's bailiwick. Accordingly, the effect of the bankruptcy court Order lifting the stay and limiting the Silva plaintiffs' recovery to insurance proceeds was to render it unnecessary for the CF Trust to make, or even consider making, a demand that defendants settle the Silva claims within the primary policy limits so as to protect against the risk of an excess judgment.

---

Alternative, to Strike Defendants' Reply and Response to Statements of Material Facts, and New Facts, Exhibits and Arguments, filed August 21, 2009 (Doc. No. 191), at 8 n. 2.

[7] Approximately $11.7 billion in unsecured claims were filed, and to-date, only about $223.4 million, or two percent of the claims, has been disbursed to CF's unsecured creditors. *See* CF Bankruptcy Case, Docket Entry No. 4116 (Second Amended Disclosure Statement for the Consolidated Plan of Liquidation dated July 1, 2004, Exhibit I); and Docket Entry No. 8240 (CF Trust's Post Confirmation Status Report as of September 30, 2009).

Respectfully submitted,

SPENCER FANE BRITT & BROWNE LLP

By:     /s/ Gerald P. Greiman
Gerald P. Greiman, #3276
ggreiman@spencerfane.com
Erik O. Solverud, #61269
esolverud@spencerfane.com
Anne M. Lindner, #533403
alindner@spencerfane.com
1 N. Brentwood Blvd., Suite 1000
St. Louis, MO 63105
Telephone (314) 863-7733
Facsimile (314) 862-4656

*Attorneys for Plaintiff*

433048.5

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2009, the foregoing document was filed electronically with the Clerk of the Court, to be served by operation of the Court's electronic filing system upon the following attorneys of record:

CARMODY MacDONALD P.C.
Gerard T. Carmody
David H. Luce
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
(314) 854-8600 (Telephone)
(314) 854-8660 (Fax)
*gtc@carmodymacdonald.com*
*dhl@carmodymacdonald.com*

THOMPSON, LOSS & JUDGE, LLP
Peter G. Thompson
Thomas J. Judge
Two Lafayette Centre
1133 21st Street, N.W., Suite 450
Washington, D.C. 20036
(202) 778-4060 (Telephone)
(202) 778-4099 (Fax)
*pthompson@tljlaw.com*
*tjudge@tljlaw.com*

Jack T. Friedman
Carroll, Burdick & McDonough, LLP
1676 N. California Blvd., Suite 620
Walnut Creek, CA 94596
(925) 944-6080 (Telephone)
(925) 256-3110 (Fax)
*jfriedman@cbmlaw.com*

*Attorneys for Defendants United States Fidelity & Guaranty Company and TIG Insurance Company*

                                                   /s/Gerald P. Greiman

433048.5