IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN GUARANTEE & LIABILITY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff/Counterclaim-Defendant, | ) ) ) | |
| v. | ) ) | |
| UNITED STATES FIDELITY AND GUARANTY COMPANY, | ) ) ) | Case No. 4:06-CV-00655-RWS |
| Defendant/Counterclaim-Plaintiff, | ) ) ) ) | |
| and | ) ) | |
| TIG INSURANCE COMPANY, | ) ) | |
| Defendant. | ) | |

### DEFENDANTS' MEMORANDUM IN RESPONSE TO THE
### COURT'S NOVEMBER 16, 2009 ORDER FOR SUPPLEMENTAL BRIEFING

Defendants United States Fidelity and Guaranty Company ("USF&G") and TIG Insurance Company ("TIG") (collectively, "Defendants") submit this memorandum in response to the Court's Order of November 16, 2009 for supplemental briefing.

### THE COURT'S QUESTIONS

**1.a.** **"At what point did the instant cause of action for purported bad faith failure to settle accrue?"**

A claim accrues when the last required element of the claim occurs. *See, e.g.*, *Crum v. Tomlinson (In re Hettick)*, 413 B.R. 733, 768-69 (Bankr. D. Mont. 2009) (evaluating when essential elements for state law claim occurred); *Winick & Rich, P.C. v. Strada Design Assocs., Inc. (In re Strada Design Assocs., Inc.)*, 326 B.R. 229, 236 (Bankr. S.D.N.Y. 2005) (same). Here, setting aside the missing settlement demand by the insured, the last essential element for a

bad faith failure to settle claim would have been the excess judgment in, and settlement of, the Silva Action in 2006. *See Amoco Oil Co. v. Reliance Ins. Co.*, No. 96-0011-CV-W-6, 1998 WL 187336, at *3-5 (W.D. Mo. Apr. 14, 1998) (holding that, under Missouri law, an excess judgment or settlement is an essential element of a bad faith failure to settle claim). Accordingly, the purported bad faith failure to settle claim against Defendants accrued post-petition in 2006. (Defs. SUF ¶¶ 201-02).

Other elements necessary to a bad faith claim, however, straddle CF's September 2002 bankruptcy petition. The USF&G policy was issued to CF pre-petition. The policy is "occurrence-based," meaning that coverage is triggered by an "accident" or an "occurrence" rather than by the assertion of a claim or the filing of a lawsuit against the insureds. (Ex. 92, Policy, Truckers Coverage Form, § II.A., at 15). The underlying accident and the Silvas' deaths occurred pre-petition. (Defs. SUF ¶¶ 1, 5, 7). Consequently, the USF&G policy's coverage for the accident was triggered pre-petition. *See, e.g.*, *Jones v. State Farm Mut. Auto Ins. Co. (In re Jones)*, 410 B.R. 632, 639 (Bankr. D. Idaho 2009) (right to coverage accrued pre-petition at the time of the accident and any insurance recovery would be proceeds of that coverage claim and property of the estate); *Field v. Transcont'l Ins. Co.*, 219 B.R. 115, 119 (E.D. Va. 1998), *aff'd*, 173 F.3d 424 (4th Cir. 1999) (same). Moreover, the Silvas' wrongful death claims accrued pre-petition and both are considered pre-petition claims, regardless of when their families filed suit (Jose Silva's parents filed suit pre-petition, while Ana Silva's parents filed suit shortly after CF's bankruptcy filing). *See, e.g.*, *Grady v. A.H. Robins, Inc.*, 839 F.2d 198, 202-03 (4th Cir. 1988) (holding that because the Bankruptcy Code's definition of "claim" includes a "contingent" right to payment, a claim against a debtor arose pre-petition for bankruptcy purposes where "the acts constituting the tort . . . occurred prior to the filing of the petition"); *see also Watson v. Parker*

*(In re Parker)*, 264 B.R. 685, 696 (B.A.P. 10th Cir. 2001) (same). The USF&G policy expressly provides that the bankruptcy or insolvency of CF does not relieve USF&G of any of its obligations under the policy. (Pl. SUF ¶ 40).

Post-petition, at a mediation in May 2004, the Silva plaintiffs demanded $5 million in settlement from TIG. (Defs. SUF ¶ 61). In December 2005, the Silva plaintiffs offered to settle for the $5 million USF&G policy limit. (Defs. SUF ¶ 95). At trial, in February 2006, the Silva plaintiffs offered to settle for $4.75 million. (Defs. SUF ¶ 151). An excess verdict was returned in March 2006, and an excess judgment and settlement followed. (Defs. SUF ¶¶ 198, 201-02).

### 1.b. "If [the purported bad faith failure to settle claim] accrued after CF entered bankruptcy, what interest did the CF Trust have in the claim?"

The purported bad faith failure to settle claim belonged to the CF Trust, even though the claim ultimately accrued post-petition.

Pursuant to 11 U.S.C. § 541(a)(1), upon the filing of a bankruptcy petition, the property of the debtor's bankruptcy estate includes, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case." *Id.* The scope of Section 541(a)(1) is exceedingly "broad," as it "includes all kinds of property, including tangible or intangible property [and] causes of action." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.9 (1983). Section 541(a)(1) includes potential or contingent interests. *See, e.g.*, *Booth v. Vaughan*, 260 B.R. 281, 285-90 (6th Cir. 2001). Section 541(a)(6) goes further to include within the estate "proceeds, product, offspring, rents, or profits of or from property of the estate." 11 U.S.C. § 541(a)(6). Section 541(a)(6) is also "quite broad" and "encompass[es] any conversion in the form of property of the estate, *and anything of value generated by property of the estate*." *In re Hanley*, 305 B.R. 84, 86-87 (Bankr. M.D. Fla. 2003) (emphasis in original) (citations omitted). "Further, to 'ensure that anything of value becomes part of the debtor's estate, Congress enacted

§ 541(a)(7), which provides that any interest in property that the estate collects or perfects post-petition is also property of the estate.'" *Id.* at 87 (citations omitted). "Congress enacted § 541(a)(7) to clarify its intention that § 541 be an all-embracing definition and to ensure that property interests created with or by property of the estate are themselves property of the estate." *In re Allen*, 226 B.R. 857, 862-63 (Bankr. N.D. Ill. 1998). In sum, "'[t]his generous provision [Section 541] sweeps into the bankruptcy estate all interests held by the debtor – even future, non-possessory, contingent, speculative, and derivative interests.'" *In re Hanley*, 305 B.R. at 86. (citations omitted).

Upon the commencement of CF's bankruptcy, the USF&G policy immediately and automatically became property of the bankruptcy estate by operation of Section 541(a)(1), as did all rights that derived from or could be exercised under that policy. The policy was an asset of the estate available to satisfy the estate's liabilities, such as the Silva pre-petition, wrongful death claims. Any potential or contingent claims or rights deriving from that insurance contract, such as a bad faith failure to settle claim, also became property of the estate at that time. Moreover, even were there any basis to dispute whether the contingent and potential bad faith claim became property of the estate at the commencement of the bankruptcy, the bad faith claim also would have become property of the estate upon the claim's ultimate accrual in 2006 pursuant to Sections 541(a)(6) and (a)(7), because that property (the bad faith claim) derived from estate property (the policy) post-petition.

In November 2004, *all* estate property – including the USF&G policy, the right to the benefits of that policy, and any value generated from that policy, such as a bad faith failure to settle claim – was transferred to the CF Trust. The Plan of Liquidation transferred "all legal or equitable interests . . . in any and all real or personal property of any nature, including any . . .

privileges, rights, . . . contractual rights . . . and any other general intangibles." (Zurich Ex. 49, Plan § 1.2.9). The CF Trust also received all "claims . . . [and] Causes of Action" that could be considered property of the estate. (*Id.*). The Plan defined "Causes of Action" as "any and all claims or causes of action which any Debtor and/or the Consolidated Estates has or asserts against a Person, including, without limitation, any claim or cause of action arising prior to the Petition Date or after the Petition Date." (*Id.* § 1.2.22). The Trust was specifically tasked then to "take actions as are necessary or useful to maximize the value of the Trust," including settling Claims and pursuing claims and Causes of Action that could be brought by a trustee or debtor-in-possession as a representative of the Consolidated Estate. (*Id.* §§ 7.2(iv) and 7.4(17)-(18) and (20)).

Thus, in 2005 and 2006, Defendants' obligations under the USF&G policy, including any obligation to settle claims in good faith, were owed to the CF Trust. Accordingly, when a purported bad faith failure to settle claim ultimately would have accrued in 2006, that claim belonged to the CF Trust. That conclusion is confirmed by the relevant case law.

In *Camp v. St. Paul Fire & Marine Insurance Co.*, 616 So. 2d 12 (Fla. 1993), an insurer issued a medical malpractice policy and a malpractice lawsuit was filed against the insured before the insured's filing for bankruptcy. *Id.* at 13. Offers for settlement were rejected by the insurer post-petition and the excess judgment was entered post-petition. The court nevertheless held that pursuant to Section 541(a)(1) the bad faith failure to settle claim was estate property and properly asserted by the Chapter 7 bankruptcy trustee. *Id.* at 13-15. The court reasoned that the malpractice policy became an asset of the bankruptcy estate upon commencement of the bankruptcy and therefore the estate "stood in the shoes" of the insured. *Id.* at 15. "'[W]hatever claim – *including potential and contingent claims* – that the bankrupt owns at the time of his

petition becomes a part of his estate, with the title thereto vested in the trustee.'" *Id.* (emphasis in original) (citations omitted). Like the USF&G policy at issue here, the malpractice policy included a provision that the insurer's obligations would be unaffected by the insured's bankruptcy or insolvency. *Id.* The court ruled that, post-petition, the insurer had continuing obligations to defend and settle in good faith, which were owed to the bankruptcy trustee in his capacity as the estate's representative. *Id.* ("Accordingly, the bankruptcy trustee, as holder of the policy, would have any cause of action that any insured would have had.").[1]

Similarly, in *Field v. Transcontinental Insurance Co.*, 219 B.R. 115 (E.D. Va. 1998), *aff'd*, 173 F.3d 424 (4th Cir. 1999), the court held that claims for breach of contract and bad faith refusal to defend, indemnify, and settle, which seemingly accrued post-petition, were nevertheless property of the bankruptcy estate and properly asserted by the Chapter 7 bankruptcy trustee pursuant to Section 541(a)(1). *Id.* at 119-20. Recognizing that the insurance policy was issued pre-petition and that the underlying auto liability claims also arose pre-petition, the court held that the breach of contract and bad faith claims were "'sufficiently rooted in [the insured's] pre-bankruptcy past'" to be part of the bankruptcy estate and asserted by the bankruptcy trustee, "regardless of whether either a declaratory judgment or bad faith cause of action existed [pre-petition]." *Id.* at 119 (quoting *Segal v. Rochelle*, 382 U.S. 375, 380 (1966)). Alternatively, the court held that the bad faith claim was the property of the estate, and properly asserted by the bankruptcy trustee, because "the policy, and thus the rights created by it, existed prior to the filing of the bankruptcy petition." *Id.* at 120 ("Because the estate now owns the rights afforded

---

[1] The United States Court of Appeals for the Eleventh Circuit subsequently affirmed that the Florida Supreme Court's holding in *Camp* was not inconsistent with federal law. *See Venn v. St. Paul Fire & Marine Ins. Co.*, 99 F.3d 1058, 1064 (11th Cir. 1996). "[W]hen [the insured] filed for bankruptcy, the estate not only took title to his contingent [bad faith failure to settle] claim but also succeeded to his contract rights under the policy. . . . Thus, [the insurer] *also* owed a duty of good faith towards the bankruptcy estate (after it came into existence) and its post-bankruptcy conduct with respect to the Camp claim is relevant." *Id.* at 1065 (emphasis in original).

[the insured] by the . . . policy, the trustee may bring the instant action to enforce those rights."); *see also Crum*, 413 B.R. at 753-54 (holding that the right to pursue a post-petition insurance bad faith claim was vested in the bankruptcy trustee pursuant to Section 541(a)(1) or (a)(7)); *Jones*, 410 B.R. at 639 (debtor's pre-petition contingent claim for underinsured motorist coverage and any subsequent recovery thereon held to be estate property pursuant to Sections 541(a)(1) and (a)(6)).

Not surprisingly then, it was the CF Trust that Zurich exhorted in 2006 to make a demand on Defendants to settle the Silva Action within the USF&G policy limit. (Defs. SUF ¶¶ 157, 159). The CF Trust represented the policyholder's interests and stood in CF's shoes for the purposes of enforcing CF's rights under the policy. *See, e.g.*, *Stanley v. Trinchard*, 500 F.3d 411, 427 (5th Cir. 2007) ("Stanley, as bankruptcy trustee, stands in the shoes of NNIC's insured."). The CF Trust's interests in the bad faith claim were clear. The Plan directed the CF Trustee to "manage," "protect," and "deal with" the USF&G policy so as to "maximize the value of the Trust." (Zurich Ex. 49, Plan §§ 7.2(iv), 7.4(4) and (25)). These duties encompassed monitoring the Silva Action (which the CF Trust did), communicating with the insurers (which the CF Trust did), and, where appropriate, lodging a demand that the insurer settle (which the CF Trust elected not to do, even though Zurich repeatedly implored it to do so).

    **2. "Did the bad faith failure to settle cause of action become part of the bankruptcy estate? If so, when and by what mechanism?"**

As set forth above, the bad faith claim, then a contingent or potential claim, became property of the estate upon the commencement of the bankruptcy, on September 3, 2002, pursuant to Section 541(a)(1). Alternatively, the claim became property of the estate (and property of Trust) when the claim would have ultimately accrued in 2006 pursuant to Sections 541(a)(6) (including as estate property anything of value generated post-petition by property of

the estate) and 541(a)(7) (property that the estate collects or perfects post-petition is also estate property).

> **3.     "What effect, if any, did the Bankruptcy Court's decision to lift the automatic bankruptcy stay and limit recovery to the applicable insurance policies have on the need for a settlement demand to have been made?"**

The Bankruptcy Court's order lifting the stay, which limited recovery to insurance proceeds, did not alter the requirement for a settlement demand by the insured's representative, the CF Trust.

Even in the ordinary, non-bankruptcy context, where an insured has purchased primary and excess layers of coverage far exceeding the value of a claim and thus has effectively insulated itself from third-party recovery, the insured's position on settlement can, as here, present an "insurmountable barrier" to a subrogated claim of bad faith by an excess insurer. *See Puritan Ins. Co. v. Canadian Universal Ins. Co.*, 775 F.2d 76, 77-78, 80 (3d Cir. 1985); *see also Certain Underwriters at Lloyd's v. Gen. Accident Ins. Co. of Am.*, 909 F.2d 228, 232-33 (7th Cir. 1990) ("the actions of the insured, who no longer possesses a financial stake in the outcome of the litigation against it, [still] can defeat the excess insurer's right of recovery," and the insured's consent to trial of the case can bar the excess insurer's recovery as a matter of law). Here, CF, in fact, had over $100 million in liability insurance, including $50 million in coverage excess of Zurich's $50 million excess policy. (Defs. SUF ¶¶ 23, 34-35, 39). Similarly, even where a bankruptcy discharge has completely insulated the insured from any personal obligation to pay a judgment, the insured's estate has been held to still have a protectable interest in avoiding an excess judgment. *See, e.g.*, *Camp*, 616 So. 2d at 14-15 (although the excess judgment was discharged and the debtor insured had no personal obligation to pay the judgment, the judgment nevertheless harmed the insured's bankruptcy estate by subjecting it to an unsecured claim).

Here, the CF Trust's financial interest in the disposition of the USF&G policy limit meant that it had a *greater* interest in the outcome of the Silva action than either a non-bankrupt insured with more-than-adequate excess coverage (as in *Puritan*) or a bankrupt insured with conventional, non-fronting insurance (as in *Camp*) would have had. To briefly reiterate, the USF&G policy has a $5 million limit of liability for each accident that is equal to the $5 million self-funded retention payable by CF. (Defs. SUF ¶ 23). CF was contractually required to pay all amounts that fell within the coverage of the USF&G policy and to indemnify USF&G for any amounts USF&G paid under the self-funded retention limit. (Defs. SUF ¶¶ 23, 27, 29). The CF Trust remained subject to those liabilities, which could be satisfied either by the $87 million in collateral previously posted by CF to meet its indemnity obligations or, if liabilities exceeded the collateral, by the Trust's assets in response to an unsecured claim by USF&G. (Defs. SUF ¶¶ 30-31, 43-44).

Accordingly, in this case, the Bankruptcy Court's decision to lift the automatic stay and limit recovery to the "applicable insurance" actually had the effect of *exposing CF's collateral* up to the $5 million limit under the USF&G policy. To the extent that a portion of the $87 million collateral could be preserved by obtaining a favorable outcome in the Silva Action, that sum might revert back to CF, and by extension to the CF Trust, for the benefit of CF's creditors in bankruptcy. *Papio Keno Club, Inc. v. City of Papillion (In re Papio Keno Club, Inc.)*, 247 B.R. 453, 459-60 (B.A.P. 8th Cir. 2000), *aff'd*, 262 F.3d 725 (8th Cir. 2001).

Moreover, USF&G filed proofs of claim in the CF bankruptcy proceeding, preserving USF&G's entitlement to reimbursement from the CF bankruptcy estate to the extent the $87 million collateral proves inadequate to satisfy CF's indemnity obligations under the fronting policy. The CF Trust thus had additional incentives to obtain a favorable result in the Silva

Action. A finding of no liability, for example, would have reduced the likelihood of an unsecured claim by USF&G against the CF Trust or, at the very least, it would have reduced the total amount of that claim. *See Shakir v. U.S. Leasing Int'l, Inc.*, No. 37664/001, 2006 WL 3758509, at *8-9 (N.Y. Sup. Ct. Dec. 22, 2006) (given a debtor-insured's continuing liability under a fronting policy, a personal injury claim under the policy could reduce the value of the debtor-insured's estate).

In sum, Zurich cannot persuasively contend that the Bankruptcy Court's decision to limit recovery to the applicable insurance policies eliminated the CF Trust's right to demand or not demand settlement, or rendered irrelevant the fact that the CF Trust chose *not* to make such a demand.

## CONCLUSION

For all of the foregoing reasons, and based upon the additional arguments in Defendants' earlier briefs in support of their Motion for Summary Judgment, the Court should grant Defendants' Motion for Summary Judgment.

Respectfully submitted,

Dated: November 24, 2009          CARMODY MacDONALD P.C.

/S/ Gerard T. Carmody
Gerard T. Carmody, #2786
David H. Luce, #11052
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
(314) 854-8600
(314) 854-8660 (Fax)
*gtc@carmodymacdonald.com*
*dhl@carmodymacdonald.com*

-- and --

Peter G. Thompson (pro hac vice)
Thomas J. Judge (pro hac vice)
THOMPSON, LOSS & JUDGE, LLP
Two Lafayette Centre
1133 21st Street, N.W., Suite 450
Washington, D.C. 20036
(202) 778-4060
(202) 778-4099 (Fax)
*pthompson@tljlaw.com*
*tjudge@tljlaw.com*

Attorneys for United States Fidelity and Guaranty Company and TIG Insurance Company

Jack T. Friedman (pro hac vice)
CARROLL, BURDICK &
McDONOUGH, LLP
1676 N. California Blvd., Suite 620
Walnut Creek, CA 94596
(925) 944-6080
(925) 256-3110 (Fax)
*JFriedman@cbmlaw.com*

Attorneys for United States Fidelity and Guaranty Company

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served on the Court's ECF system via electronic mail, on November 24, 2009, to:

Gerald P. Greiman, #3276
Erik O. Solverud, #61269
Anne M. Lindner, #533403
1 N. Brentwood Blvd., Suite 1000
St. Louis, MO 63105
Telephone (314) 863-7733
Facsimile (314) 862-4656
*ggreiman@spencerfane.com*
*esolverud@spencerfane.com*
*alindner@spencerfane.com*

*Attorneys for Plaintiff*

*/s/* Gerard T. Carmody