# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN GUARANTEE<br>& LIABILITY INSURANCE<br>COMPANY, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff/Counterclaim-<br>Defendant, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 4:06CV655RWS |
| | ) | |
| UNITED STATES FIDELITY<br>& GUARANTY COMPANY, | ) | |
| | ) | |
| | ) | |
| Defendant/Counterclaim-<br>Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TIG INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff/Counterclaim-Defendant American Guarantee & Liability

Insurance Company ("Zurich") alleges Defendant/Counterclaim-Plaintiff United

States Fidelity & Guaranty Company ("USF&G") and Defendant TIG Insurance

Company failed to settle in good faith a lawsuit that was brought by the families of

Jose Silva and Ana Silva against their mutual insured, Consolidated Freightways

Corporation ("CF").  In this consolidated lawsuit,[1] Zurich seeks to recover the

seventeen million dollars it paid to the Silva families as CF's excess insurer from

CF's primary insurer (USF&G) and its claims handler (TIG), and USF&G seeks a

declaration that it has no further obligations in connection with the Silva lawsuit.

USF&G and TIG (collectively referred to as "Defendants") have moved for

summary judgment on several bases, among them that under Missouri law, Zurich,

as the insurer, cannot bring a lawsuit for bad faith failure to settle.  Because

Missouri law prevents Zurich from bringing this lawsuit as a subrogee and the

Eighth Circuit has previously concluded that Missouri law prohibits the

assignment of bad faith failure to settle claims, I will grant summary judgment in

favor of USF&G and TIG.

*Background*

This controversy began with a horrific eleven-vehicle accident on

I-44 near Joplin, Missouri on May 18, 2002.  Five people died, including Ana

Silva and her husband, Jose Silva.  Ana burned to death at the scene.  Jose,

---

[1] On April 19, 2006, USF&G brought a complaint in this Court against Zurich seeking
declaratory relief.  On August 31, 2006, Zurich filed a complaint against USF&G and TIG (Case
No. C06-1254RSM) in the United States District Court for the Western District of Washington
for negligence, bad faith and other violations of Washington law.  Under the "first to file" rule,
the Western District of Washington transferred Zurich's action to this District on December 4,
2006.  The transferred action was assigned to Magistrate Judge Adelman under Case No.
4:07CV201TIA.  On February 5, 2007, the transferred action was consolidated into the action
initially filed in this Court.

however, was found alive, but badly burned. He died from his injuries thirty-seven days later after enduring twenty-eight surgeries, 174 blood transfusions and amputations of his right leg and all the fingers of his right hand. His doctors tried to give him morphine to ease his pain, but, they explained, one can only give someone in Jose's condition so much morphine before his body's systems will shut down. His medical providers testified they saw Jose's face grimacing in pain as he fought for his life, and how, even in his condition, he asked about the condition of his wife.

The families of Ana and Jose Silva ("the Silva plaintiffs") brought wrongful death lawsuits against several parties involved in the collision, including CF, in the St. Louis City Circuit Court.[2] Before their case was tried, the Silva plaintiffs reached settlements with all defendants except CF and its driver. In February 2006, the case was tried in the City of St. Louis. CF's driver was dismissed from the lawsuit at the start of the trial, leaving CF as the sole defendant. The trial resulted in a jury verdict of approximately $46 million[3] for the Silva plaintiffs.

---

[2] Jose Silva's parents initiated their lawsuit on August 9, 2002. Ana Silva's parents initiated their lawsuit on October 26, 2002. Their lawsuits were tried together.

[3] The jury awarded Jose Silva's parents $25,280,000. The jury also awarded Ana Silva's parents $20,780,000.

*CF's Insurance*

Zurich and USF&G both insured the CF tractor-trailer that was involved in the collision on I-44. USF&G was CF's primary insurer. Zurich was one of CF's excess insurers. TIG became USF&G's claims manager in 2004, during the pendency of the Silva lawsuit.

When the USF&G policy was issued, it was a "fronting" policy.[4] The policy had a $5 million limit of liability for each accident, but there was a $5 million self-funded retention for each accident payable by CF that was equal to the $5 million policy limit. Contemporaneous with the issuance of the fronting policy, CF and USF&G entered into an indemnity agreement. In the agreement, CF promised to indemnify USF&G if USF&G paid or "fronted" amounts otherwise payable by CF under the self-funded retention. The indemnity agreement also required CF to post collateral totaling $87 million to back its indemnity commitment. CF posted collateral that consisted of a $25 million surety bond and letters of credit in the aggregate amount of $62 million.

---

[4] A fronting policy, where the insured retains the risk for payment on losses, is significantly less expensive than a standard policy in which the risk of loss within the policy limit is transferred completely to the insurer.

In addition to the self-funded retention, CF maintained a $3 million layer of excess insurance underwritten by one of its own affiliates, Consolidated Freightways Risk Management, which would later be insolvent and unable to perform its obligations. CF had an additional $50 million layer of insurance underwritten by Zurich.[5] In addition to the Zurich coverage, CF had another $50 million of excess insurance issued by St. Paul and Kemper.[6]

Under the self-funded retention endorsement in the USF&G policy, USF&G had "the right, duty and ultimate authority to investigate, defend or settle any claim or 'suit'" against CF. USF&G would "delegate the responsibility to investigate, defend and/or settle all claims or 'suits' to" CF subject to certain conditions.

Under the Zurich policy, Zurich did "not have the duty to assume control of the investigation, settlement or defense of any claim against the inured." But Zurich did, "however, have the right to participate in the investigation, settlement or defense of any claim or suit that [Zurich felt] may create liability on [its] part under the terms of th[e] policy."

---

[5] Under the Zurich policy, Zurich agreed to "pay on behalf of the **insured**, those damages covered by this insurance in excess of the total applicable limits of **underlying insurance**" (emphasis in original).

[6] The Silva verdict did not implicate the St. Paul and Kemper excess layers of insurance.

*CF's initial response to the Silva lawsuit*

As described above, under the self-funded retention, USF&G delegated to CF the responsibility to investigate, defend and/or settle all claims. To accomplish this, CF retained a third-party administrator, Sedgwick Claims Management Services ("Sedgwick CMS"), to handle claims against it. Sedgwick CMS undertook the initial investigation of the May 18, 2002 accident on I-44. It also retained counsel to defend CF in the Silva lawsuit.[7]

*CF files for bankruptcy*

On September 3, 2002, CF and some of its affiliates filed for bankruptcy protection under Chapter 11. The bankruptcy filing triggered an automatic stay of the Silva lawsuit. In August 2003, the Bankruptcy Court granted limited relief from the stay and permitted the Silva lawsuit to go forward against CF, provided that any recovery would be limited to "any applicable insurance coverage the Debtors may have, . . . co-defendants of the Debtors or . . . state agencies or similar sources."

---

[7] As discussed below, the counsel retained by Sedgwick CMS was replaced by counsel retained by TIG in 2004.

In November 2004, the Bankruptcy Court confirmed a liquidation plan ("Plan") that provided for the liquidation of CF's assets and the distribution of the proceeds to creditors through the Consolidated Freightways Corporation Trust ("CF Trust"), which was created pursuant to a Liquidation Trust Agreement approved as part of the Plan.

The CF Trust is a liquidating trust that was established and became effective in December 2004 to basically hold all the assets of the old CF debtor companies for the purposes of the final liquidation of the bankrupt estates. Pursuant to the Plan, CF was dissolved and ceased to exist on December 31, 2004. As a result, all employees of CF were terminated in December 2004.[8]

The Liquidation Trust Agreement provides, in part:

> b.    <u>Purposes of Trust</u>
>
> The purposes of the Trust created hereunder are to (i) liquidate, sell or otherwise dispose of the Trust Property, (ii) cause all proceeds of Trust Property to be deposited into the Trust in accordance with the Plan and this Trust Agreement, (iii) control, defend, prosecute, settle, and/or pursue the resolution or litigation of all claims, rights, Avoidance Actions and other Causes of Action included in the Trust Property, in each such case, in accordance with the Plan and this Trust Agreement, (iv) oversee and, where appropriate, directly initiate actions to resolve any remaining issues regarding the allowance and payment of

_____

[8] Several employees of CF became employees of the CF Trust.

Claims, including, as necessary, initiation and/or participation in proceedings before the Court, (v) make Distributions of Trust Property or Cash to Trust Beneficiaries, and (vi) take such actions permitted hereunder that are necessary or useful to maximize the value of the Trust including, without limitation, the borrowing of funds and the retention of employees.

The parties agree that the USF&G and Zurich insurance policies were not among the contracts assumed and assigned to the CF Trust. Defendants assert that as non-executory contracts, they automatically became part of the CF bankruptcy estate and were transferred as part of the estate's property to the CF Trust as a matter of law. Zurich disputes this and argues the contracts did not become the property of the CF Trust. The parties agree that the CF Trust was never the "insured" under the USF&G policy.

The parties disagree about the effect the bankruptcy had on the indemnity agreement between CF and USF&G. Zurich asserts that under the indemnity agreement, the fronting aspect of the policy was "effectively terminated" when CF became insolvent and filed for bankruptcy. USF&G and TIG deny that the bankruptcy filing terminated the fronting aspect of the policy.

Section VI of the indemnity agreement states,

<u>TERMINATION OF POLICY(IES)</u>

Notwithstanding any other provisions of this Agreement or remedies which Company may have under this Agreement or otherwise, it is expressly understood and agreed that any breach by Insured of its obligations under Sections IV. and V. above, if not remedied within ten (10) business days after written notice shall constitute an immediately effective cancellation by Company of **each and every Policy(ies)** whose terms have not yet expired, except as otherwise provided by law (emphasis added).

Zurich has not identified any evidence among the more than 2,600 pages submitted by the parties that shows that written notice (which would trigger § 6's termination clause) was ever sent. Moreover, the clause states that *the policy* would be cancelled, not that *the fronting aspect* of the policy would be cancelled. The parties agree the policy was not cancelled. USF&G paid on the policy. It is that payment that gives rise to this dispute.

Additionally, there is evidence that USF&G used the collateral posted in association with the indemnity agreement to pay on claims against CF, which would mean the fronting aspect remained in effect. Kerry Morgan, the Chief Executive Officer of K. Morgan Enterprises, Inc., was the trustee for the CF Trust. Morgan testified that $86 million was posted as collateral immediately prior to

CF's bankruptcy filing.[9]  On August 26, 2008, USF&G informed the Bankruptcy Court that it had indeed received $87 million in proceeds from the surety bond and letters of credit.[10]  Morgan explained that the purpose of the collateral was "for the benefit or use of the payment of claims by the insurer" in the event of a bankruptcy or insolvency.  Morgan added that, after the bankruptcy filing, the collateral "was all drawn by USF&G."  The record does not support Zurich's assertion that the fronting aspect of policy was terminated by CF's bankruptcy.

*TIG takes over claim-handling*

In March 2004, all of Sedgwick CMS's claim-handling functions were transferred to TIG.  The transfer of claim-handling responsibility to TIG was a by-product of a reinsurance transaction, known as a Loss Portfolio Transfer ("LPT"), between TIG's affiliate, nSpire, and USF&G.  Under the LPT and its related agreements, TIG was granted the authority to investigate, defend, and settle claims

---

[9] The deposition is not clear whether the collateral was posted immediately prior to the bankruptcy filing or whether Morgan is simply describing the cumulative amount that had been posted prior to the bankruptcy filing.  Other evidence suggest the collateral was valued at $87 million.

[10] On November 30, 2009, the United States Bankruptcy Court for the Central District of California, Riverside Division, issued a memorandum decision in In re: Consolidated Freightways Corporation of Delaware, et al., Case No. 6:02-bk-24284-PC, regarding USF&G's claim against the CF bankruptcy estate.

arising under the USF&G fronting policy issued to CF. TIG assigned the CF-Silva claim to a claims handler named Susan Dove. Robert Knowles, TIG's Vice-President of Claims, also worked on the Silva claim. TIG's President, Scott Donovan, was also involved with the claim.

Shortly after the transfer of the claim from Sedgwick CMS to TIG, in May 2004, TIG retained Michael Lawder to defend CF. Lawder represented CF as trial counsel. In February 2006, the case was tried in the Circuit Court for the City of St. Louis, Missouri. The jury returned its verdict in March 2006.

*Settlement demands by the Silva plaintiffs*

Before the trial in 2006, the Silva plaintiffs made a series of demands to settle their claims against CF. On November 6, 2003, the Silva plaintiffs offered to settle their claims against CF for $20 million. CF did not accept that settlement offer.

In April 2004, Dove attended a mediation at which the Silva plaintiffs demanded CF's primary policy limits of $5 million. Dove's claims notes state that "[t]he demand was $5 million unless we confirmed the existence of excess insurance, which had yet to be clarified." When she was later deposed, Dove stated, after reviewing her notes, that the Silva plaintiffs "wanted our policy limits

of $5 million, and in the event of [sic] excess coverage was available, he wanted all of that, as well." Dove responded to the Silva plaintiffs that CF was still in the early stages of investigating the claims, but she nevertheless made a counteroffer of $250,000.

In October 2005, the Silva plaintiffs' counsel suggested the parties again explore mediation and settlement. The Silva plaintiffs wanted a new offer, but TIG reiterated its earlier $250,000 offer. Counsel for the Silva plaintiffs responded that he would not recommend mediation to his clients under those circumstances. On December 21, 2005, the Silva plaintiffs sent a letter demanding $5 million to settle their claims. TIG chose not to make a counter-offer.

Just before the trial was about to begin, Knowles made the Silva plaintiffs an offer of $500,000. The Silva plaintiffs responded by demanding $4.75 million. During the trial, TIG offered the Silva plaintiffs a "high-low" settlement in which the Silva plaintiffs would, no matter the outcome at trial, be guaranteed a low of $250,000 and would receive a high of $2 million upon receiving a gross verdict of $2 million or higher. The Silva plaintiffs rejected TIG's high-low offer and made no counter, other than to state that their previous demand of $4.75 million was still on the table. Zurich's attorney, Brad Baumgart, testified that the Silva's attorney

told him there would not be any high-low agreement without Zurich's involvement. Baumgart did not pursue a settlement that involved Zurich.

After TIG suggested the high-low settlement, it did not make another offer. When Peter Drever, the principal claim handler at Zurich, suggested TIG offer its $2 million reserves, Knowles responded that the case was not worth that much.

*No admissible evidence the CF or CF Trust made a settlement demand*

There is no admissible evidence that either CF or the CF Trust ever demanded USF&G or TIG settle with the Silva plaintiffs. Zurich claims that under the Liquidation Trust Agreement,[11] the CF Trust lacked authority to direct any decisions or settle cases like the Silva lawsuit. Defendants dispute that assertion and rely on the Liquidation Trust Agreement which provides,

> The Trustee shall have the power and authority to . . . (21) Institute on behalf of the Trust all claims and Causes of Actions which could be brought by a trustee or debtor-in-possession under the Bankruptcy Code, and prosecute and defend all appeals on behalf of any of the Debtors, as representative of the Consolidated Estate.

---

[11] As described earlier, the Liquidation Trust Agreement created the CF Trust as part of the bankruptcy liquidation plan.

Representatives of the CF Trust were aware that the CF Trust could demand TIG settle the Silva lawsuit within the policy limits. TIG's attorney, Lawder, testified that he informed Kim Mingo that, as a CF Trust representative,[12] she had the right to demand TIG settle the lawsuit within the policy limits. Mingo testified that Lawder informed her that, if she thought the case should settle, she should "probably call" Dove. Mingo also testified that Baumgart, Zurich's attorney, suggested that CF[13] should contact Dove and demand that TIG settle the case.

Mingo testified that when she contacted Dove, she told Dove that Baumgart "believed that CF should settle the case and that we should demand that TIG settle the case." Zurich has offered no admissible evidence that Mingo actually made a demand that TIG settle the Silva case, however.

Baumgart tried to persuade Tammy Burris, an employee of the CF Trust,[14] to make a written demand that TIG attempt to negotiate the Silva lawsuit in good faith. On February 22, 2006, Baumgart sent an email to Burris in which he wrote he "would hope that hearing from you in writing demanding that TIG attempt to

---

[12] At this point, Mingo was an employee of the CF Trust. She has not been employed by CF since December 2004.

[13] Mingo's deposition says CF, not the CF Trust.

[14] At this point, Burris was also an employee of the CF Trust. Like Mingo, she has not been employed by CF since December 2004.

negotiate this case in good faith instead of stonewalling the plaintiff may move them to undertake the duty they have to negotiate this case in good faith rather than gambling on the results of what is apparently a serious case with a significant downside." Burris testified at her deposition that the CF Trust made a decision "not to respond, not to send a letter." Burris also testified that she understood that settlement negotiations were already occurring so it was unnecessary to ask TIG to conduct settlement negotiations.

Morgan[15] testified that the CF Trust did not ever make a request or demand to TIG that it settle the Silva case for $5 million.[16] Morgan also testified that the CF Trust never demanded that USF&G settle the case within the primary policy limits.

In January 2005, TIG's claims handler inquired whether CF's excess insurers had been placed on notice of the Silva lawsuit. When Burris contacted CF's broker, she was told that "[i]t is very possible that this claim was never reported." The parties agree that (to their knowledge), Burris did nothing else

---

[15] At this point, Morgan was the CEO of K. Morgan Enterprises, Inc., the trustee of the CF Trust. Like Mingo and Burris, he has not been employed by CF since December 2004.

[16] Curiously, Zurich disputes this fact. Page 184 of the transcript of the Morgan deposition, which was filed in support of Defendants' motion for summary judgment, clearly shows Morgan so testified.

with respect to putting CF's excess insurers on notice of the Silvas' claims against CF.

Zurich was notified of the Silva lawsuit in January 2006. Zurich recognized the late notice as a potential issue, but did not pursue it.[17] David Zeigler, Drever's superior at Zurich, explained that Zurich decided it would be unlikely to prevail in court if it denied coverage based on lack of notice.

After Zurich learned of the Silva lawsuit, Zurich conducted its own evaluation of the risks associated with going to trial. Zurich used a different evaluation process than TIG and USF&G. Zurich's case summary report concluded there was an 80% chance of a plaintiffs' verdict and a 25% chance the verdict would reach $23.5 million.

In February 2006, Zurich sent a series of letters to TIG. These letters urged TIG to negotiate a settlement in good faith within the policy limits,[18] stated Zurich's position that a failure to settle the claim by contributing the primary

---

[17] Zurich disputes in part ¶ 129 of Defendants' Statement of Uncontroverted Material Facts, but Zurich does not clearly identify the allegations with which it agrees and those it disputes. Drever of Zurich testified that the late notice "was a recognized issue in the case but that it was not used as the basis of a denial of coverage. . . Zurich chose not to pursue the late notice as to the insured. . . ."

[18] Letter dated February 16, 2006; letter and email dated February 22, 2006.

policy limits would constitute a breach of USF&G's duty of good faith,[19] "demanded" that TIG settle the case within the policy limits,[20] and warned that in the event of an excess judgment, Zurich would have "no alternative" to look to USF&G to satisfy any portion of the judgment that exceeded the primary policy limits.[21] Baumgart also made a handwritten demand on TIG after opening statements.

*The outcome at trial*

As noted above, the Silva lawsuit was tried in the City of St. Louis in February 2006. Before the trial, the Silva plaintiffs reached settlements with all defendants except CF and its driver. These settlements resulted in a total setoff figure of almost $5.1 million. The setoffs meant that the Silva plaintiffs would need the jury verdict to exceed $5.1 million before there could be any recovery from CF. In other words, they would need to secure a jury verdict exceeding $10.1 million before the limit of the USF&G policy would be exhausted. Because the Zurich policy would not "drop down" to replace the insolvent $3 million layer

_____

[19] Letter dated February 17, 2006; letter and email dated February 22, 2006.

[20] Email dated February 21, 2006; letter and email dated February 22, 2006, email dated February 23, 2006.

[21] Letter dated February 17, 2006; letter and email dated February 22, 2006.

immediately above the $5 million USF&G policy, a jury verdict would have to be in excess of $13.1 million before the Silva plaintiffs could recover the first dollar from Zurich's insurance policy.

At trial, the Silva plaintiffs asked the jury to award $50 million in damages. The jury rendered a verdict of approximately $46 million. After post-trial motions, the trial court reduced the verdict to $30 million. The verdict was then further reduced to slightly less than $25 million as a result of the setoffs described above. Following post-trial rulings, and before any appellate proceedings had occurred, Zurich negotiated a settlement for $22 million, which included $5 million from USF&G and $17 million from Zurich (the $3 million discrepancy between the $22 million settlement and the $25 million net reduced judgment was due to the inability to collect the insolvent $3 million excess layer of insurance that lay between the USF&G and Zurich layers).

The parties have submitted numerous pages to support other factual allegations concerning TIG's and others' assessments of the settlement value of the Silva lawsuit, the insurance reserves and their meaning, a reinsurance contract between TIG's and USF&G's affiliates, the availability of eyewitness and expert testimony to assist in developing an understanding of what occurred to the Silvas' vehicle during the accident, the concerns about CF trial counsel's ability to

properly defend CF, the testimony presented at the Silva trial, and the perception of that testimony as favorable or unfavorable. Many of the factual allegations are disputed. Many are not. I do not recite them here because they are not material to my determination that USF&G and TIG are entitled to judgment as a matter of law because only CF or the CF Trust, not Zurich, can legally pursue this bad faith failure to settle claim under Missouri law.

### *Legal Standard*

In considering whether to grant summary judgment, a district court examines the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. <u>Lynn v. Deaconess Medical Center</u>, 160 F.3d 484, 486 (8th Cir. 1998). When a genuine issue of material fact exists, summary judgment should not be granted.

The party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the affidavits, pleadings, depositions, answers to interrogatories, and admissions on file which it believes demonstrates the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When such a motion is made

and supported by the movant, the nonmoving party may not rest on his pleadings

but must produce sufficient evidence to support the existence of the essential

elements of his case on which he bears the burden of proof.  Id. at 324.  In

resisting a properly supported motion for summary judgment, the nonmoving party

has an affirmative burden to designate specific facts creating a triable controversy.

Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1113 (8th Cir. 2004).

## *Discussion*

In the instant lawsuit, Zurich asserts claims for bad faith refusal to settle,

negligence and violations of Washington law, or in the alternative, for bad faith

refusal to settle under Missouri law.  Because Washington law does not apply,[22]

only Zurich's claim for bad faith refusal to settle remains.

Defendants argue that Zurich's purported subrogated bad faith claim fails as

a matter of law because Defendants owed no direct duty to Zurich and Zurich

cannot pursue this lawsuit as an assignee or subrogee.  Defendants also argue that,

even if Zurich had standing to bring the bad faith failure to settle claim, the claim

---

[22] On October 20, 2009, I determined that this lawsuit is governed by Missouri law
because Missouri has the most significant and relevant contacts to Zurich's claims concerning the
Silva litigation.  That order [doc. 202] and its choice-of-law analysis are incorporated herein as
part of this order.

fails because Missouri law requires that the insured make a settlement demand and neither CF nor the CF Trust made such a demand. Defendants further argue they are entitled to judgment because Zurich cannot establish causation or that Defendants acted in bad faith when they failed to settle the Silva lawsuit.[23]

Zurich responds that a bad faith failure to settle claim may be assigned under Missouri law and the claim may be brought under either contractual or equitable subrogation. Zurich also argues that a settlement demand is not an essential element for a bad faith failure to settle claim against Defendants. Finally, Zurich argues it can establish causation and that an excess verdict was foreseeable.

*Ability to bring this suit*

The threshold issue is whether Missouri law permits Zurich, as an excess insurer, to bring a lawsuit for bad faith failure to settle against the primary insurer as a result of a direct duty owed by a primary insurer to an excess insurer, as an assignee, or under principles of subrogation.

Some jurisdictions impose a duty of good faith on the relationship between primary and excess insurance carriers. "Missouri courts, however, have not

---

[23] Specifically, Defendants argue that Zurich cannot prove that, but for their alleged bad faith, the Silva lawsuit would have settled for an amount between $2 million and $3 million and that an excess verdict was not reasonably foreseeable.

recognized a direct duty of good faith between primary and secondary insurer."
Reliance Ins. Co. in Liquidation v. Chitwood, 443 F.3d 660, 664 (8th Cir. 2006).
Zurich recognizes that USF&G and TIG owed it no direct duty of good faith, but
asserts that it is entitled to pursue its bad faith claim under principles of
subrogation or through an assignment.

An assignment is "[t]he transfer of rights or property." Black's Law
Dictionary (8th ed. 2004). Subrogation, however, is "[t]he substitution of one
party for another whose debt the party pays, entitling the paying party to rights,
remedies, or securities that would otherwise belong to the debtor." Id.

Defendants argue that under Missouri law, "subrogation—whether
conventional or equitable—*is* assignment." Defendants cite several cases from the
Missouri Courts of Appeals that arguably equate the two theories. For example, in
Travelers Indem. Co. v. Chumbley, 392 S.W.2d 418, 422–23 (Mo. Ct. App. 1965),
the Missouri Court of Appeals concluded that the status of a party proceeding by
way of conventional (i.e. contractual) subrogation "is, in legal effect, that of an
assignee. . . ." See also Forsthove v. Hardware Dealers Mut. Fire Ins. Co., 416
S.W.2d 208, 221 (Mo. Ct. App. 1967) (referring to "so called subrogation"); Hays
v. Missouri Highways and Transp. Comm'n, 62 S.W.3d 538, 540 (Mo. Ct. App.

2001) (equating "assignment, subrogation interest, or agreement to reimburse").

"While subrogation is frequently equated with assignment and has been referred to as assignment by operation of law, the two methods are, at least for some purposes, distinct." Warren v. Kirwan, 598 S.W.2d 598, 599 (Mo. Ct. App. 1980). In Keisker v. Farmer, 90 S.W.3d 71, 74 (Mo. 2002), the Supreme Court of Missouri explained,

> Assignment of a claim *differs* from subrogation to a claim. Holt v. Myers, 494 S.W.2d 430, 437 (Mo.App.1973). In assignment, the assignor gives all rights to the assignee. Id. By an assignment, the insurer receives legal title to the claim, and the exclusive right to pursue the tortfeasor. See State Farm Mut. Auto. Ins. Co. v. Jessee, 523 S.W.2d 832, 834 (Mo.App.1975); Kroeker v. State Farm Mut. Auto. Ins. Co., 466 S.W.2d 105, 109-10 (Mo.App.1971).
>
> In subrogation, the insured retains legal title to the claim. Hagar v. Wright Tire & Appliance, Inc., 33 S.W.3d 605, 610 (Mo.App.2000). By paying the insured, the insurer has a right to subrogation. Id. (emphasis added).

In this lawsuit, Defendants concede that the insurance contract between CF and Zurich transferred rights of recovery to Zurich.[24] This contractual provision,

---

[24] Section VI of the Commercial Umbrella Liability Policy issued by Zurich to CF provides:

> 15.    Transfer of Rights of Recovery Against Others to Us
>     a.    If the insured has rights to recover all or part of any payment we have made under this insurance, those

however, does not permit Zurich to sue Defendants on CF's behalf. Under Missouri law, "[t]he exclusive right to pursue the tortfeasor remains with the insured, which holds the proceeds for the insurer." Id. "This is true even though the insurer is subrogated to the entire cause of action." Warren, 598 S.W.2d at 599. "If the interest of the insurer is derived by subrogation, the action must be brought by, or at least in the name of, the insured." Id.

The same barrier prevents Zurich from bringing this lawsuit under the doctrine of equitable subrogation. "The law of Missouri has long held that in a claim for equitable subrogation, in the absence of an assignment, the subrogee owns only an equitable interest in the claim." Cretcher Lynch & Co. v. Nat'l Council on Comp. Ins., Inc., 149 F.3d 817, 819 (8th Cir. 1998).

It is undisputed that this lawsuit was brought by Zurich, and not by CF (or the CF Trust) or in the name of CF (or the CF Trust). As a result, Zurich may not

rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring suit or transfer those rights to us and help us enforce them

b.      Any amount recovered will be apportioned in the inverse order of payment of loss to the extent of actual payment. The expenses of all such recovery proceedings will be apportioned in the ratio of respective recoveries.

At oral argument, counsel for TIG stated, "we have not contended that that provision by its terms doesn't apply . . . to a bad faith failure to settle claim."

seek recovery from Defendants under either contractual or equitable subrogation. Only CF or the CF Trust could have legal title to the claim.

Whether Zurich could bring its bad faith failure to settle claim as an assignee is a different matter. Zurich argues that it is entitled to bring a bad faith failure to settle claim as an assignee and that an Eighth Circuit decision to the contrary is merely dicta.

"It is well settled that in Missouri, a claim for personal injury cannot be assigned, in whole or in part." Hays, 62 S.W.3d at 540.[25] The "prohibition was adopted by the courts of [Missouri] to prevent the trafficking of lawsuits for pain and suffering." Id.

The prohibition does not extend to all torts. For example, in Beall v. Farmers' Exch. Bank of Gallatin, 76 S.W.2d 1098, 1099–1100 (Mo. 1934), the Supreme Court of Missouri held that a cause of action for fraud and deceit was assignable. The court explained, "[p]ractically the only classes of choses in action which are not assignable are those for torts for personal injuries, and for wrongs

_____

[25] In Hays, the Missouri Court of Appeals recognized "the longstanding policy prohibiting the assignment, forced or otherwise, of a personal injury claim whether denominated as an assignment, subrogation interest, or agreement to reimburse." 62 S.W.3d at 540. Hays involved an insurer's attempt to obtain a subrogation interest in its insured's potential personal injury action against a third party tortfeasor for the same injury the insured sought coverage from the insurer. Id. at 539. The case did not involve a subrogation interest in a tort that occurred apart from a personal injury claim.

done to the person, the reputation, or the feelings of the injured party, and those based on contracts of a purely personal nature, such as promises of marriage." <u>Id.</u> at 1099.

Some Missouri courts have permitted the assignment of bad faith failure to settle claims. For example, in <u>Ganaway v. Shelter Mut. Ins. Co.</u>, 795 S.W.2d 554, 564–65 (Mo. Ct. App. 1990), the Missouri Court of Appeals determined that a bad faith failure to settle claim was assignable because it became part of the bankruptcy estate via statutory authorization. In another case from the Missouri Court of Appeals that did not involve a bankruptcy, the assignees brought suit against the insurer for bad faith refusal to settle. <u>See</u> <u>Bonner v. Auto. Club Inter-Ins, Exch.</u>, 899 S.W.2d 925, 927 (Mo. Ct. App. 1995). The court affirmed summary judgment because the plaintiffs did not establish the essential elements, but did not address the issue of whether the plaintiffs could bring the lawsuit as assignees. <u>Id.</u> at 927–928.

In <u>Johnson v. Allstate Ins. Co.</u>,262 S.W.3d 655, 658 (Mo. Ct. App. 2008), the Missouri Court of Appeals upheld a jury verdict for bad faith refusal to settle that had been assigned. The majority did not address the assignability of a bad faith failure to settle claim because it was not raised on appeal. <u>Id.</u> at 667 n.6. The concurrence, however, addressed the issue and questioned whether the trend in

Missouri law to treat bad faith failure to settle cases as assignable is correct. Id. at 669–75 (Smart, J., concurring). Judge Smart explained that, "because neither the Court of Appeals nor the Missouri Supreme Court have addressed the matter of public policy differences between assignment of BFFS [(bad faith failure to settle)] claims and assignment of other personal tort claims," he believed the issue of assignability of bad faith failure to settle claims, when properly preserved, may be ripe for adjudication. Id.

I need not make my own prediction about how the Missouri Supreme Court would resolve the question because the Eighth Circuit has previously concluded that Missouri law does not permit the assignment of a bad faith failure to settle claim. Quick v. Nat'l Auto Credit, 65 F.3d 741 (8th Cir. 1995). In Quick, after Wilhite caused the death of a young girl, a default judgment was entered against him. Id. at 743. Wilhite then assigned his bad faith failure to settle claims against his insurer[26] to the decedent's mother, Quick. Id.

The Eighth Circuit first determined that the insurer could not have breached a fiduciary duty to give good faith consideration of offers to settle because it did

<hr>

[26] The "insurer" in this case was actually a rental car company, not an insurance company. Quick, 65 F.3d at 745. It was a self-insurer, however. Id. For purposes of this discussion, as it relates to the ability to bring a bad faith failure to settle claim, its status as a self-insurer is not determinative. Id. Therefore, I will use the term "insurer" to refer to the rental car company.

not have the exclusive right to settle claims—it "lack[ed] the total control over the settlement process which would be necessary to impose upon [the insurer] the duty to settle in good faith." Id. at 746. The court then concluded that a claim for bad faith failure to settle is nonassignable under Missouri law. Id. at 746–47.

Zurich argues that the Eighth Circuit's decision in Quick that bad faith failure to settle claims are not assignable was simply dicta and inconsistent with, and a misinterpretation of Missouri law. Zurich claims that because the Eighth Circuit first determined that the insurer did not owe a fiduciary duty to settle in good faith, the court's discussion about the assignability of bad faith failure to settle claims was "pure dicta" and entitled to "little, if any, weight in the context of this case."

The Eighth Circuit's conclusion that bad faith failure to settle claims are not assignable is not dicta. As a primary matter, I note that the court specifically deemed its conclusion a holding. Id. at 747 ("Accordingly, we hold that Wilhite's bad faith cause was nonassignable. Thus, Agency is entitled to judgment as a matter of law on this claim."). More important than the court's designation of this conclusion as a holding, however, is the fact that it goes directly to the heart of whether Quick could bring the lawsuit, a threshold issue in any suit. As a result,

Zurich's argument that <u>Quick</u> does not direct my decision because it is <u>dicta</u> is unpersuasive.

Zurich's argument that <u>Quick</u> is inconsistent with and a misinterpretation of Missouri law is not one that I can remedy. Absent a clear statement of the Supreme Court of Missouri that clarifies Missouri law, <u>Quick</u> is the law of this circuit and only the Eighth Circuit or the Supreme Court can overturn it. As a result, I find that Zurich cannot bring this lawsuit against Defendants either as a subrogee or an assignee.

*Failure to demand settlement*

Defendants argue that, even if Zurich could bring a bad faith failure to settle claim against Defendants as an assignee or subrogee, Zurich cannot prevail because under Missouri law, a settlement demand is a required element of a bad faith claim and no demand was made in the Silva lawsuit.[27] Zurich argues that CF and the CF Trust are distinct entities and therefore the CF Trust's omission (by failing to demand settlement) is immaterial.

---

[27] Defendants also argue that under Washington law, the CF Trust's consent to TIG's defense of the Silva lawsuit to verdict bars Zurich's bad faith claim. As discussed above, I previously determined that Missouri, not Washington, law applies. As a result, I will not address this argument concerning Washington law.

For sixty years, Missouri courts have recognized a tort claim for bad faith failure to settle.  Zumwalt v. Utilities Ins. Co., 228 S.W.2d 750 (Mo. 1950).  In Dyer v. Gen. Am. Life Ins. Co., 541 S.W.2d 702, 704 (Mo. Ct. App. 1976), the Missouri Court of Appeals noted that

> The elements of the tort *appear to be* that (1) the liability insurer has assumed control over negotiation, settlement, and legal proceedings brought against the insured; (2) the insured has demanded that the insurer settle the claim brought against the insured; (3) the insurer refuses to settle the claim within the liability limits of the policy; and (4) in so refusing, the insurer acts in bad faith, rather than negligently (emphasis added).

Some Missouri courts have interpreted the second element—that "the insured has demanded that the insurer settle the claim"—to be "an essential element of the tort."  See, e.g., Bonner, 899 S.W.2d at 928.  Other opinions have suggested that a demand is not always required.  Quick, 65 F.3d at 745.  For example, the District Court for the Western District of Missouri predicted "that when the precise question is presented to a Missouri court, it will be held that the making of a demand by the insured and a rejection of the demand by the insurer is not an essential element of a plaintiff's claim that the defendant's bad faith failure

to settle [sic]." H & S Motor Freight, Inc. v. Truck Ins. Exch., 540 F. Supp. 766, 769 (W.D. Mo. 1982).[28]

A demand is not required if the insurer has failed to notify the insured of an offer of settlement because "if the insured were not advised of the offers of settlement, he could not have demanded that the offer be accepted." Ganaway, 795 S.W.2d at 564. Similarly, when an insurer refuses to provide a defense to the insured "it cannot avoid liability because the insured fails to make a futile demand." Shobe v. Kelly, 279 S.W.3d 203, 211 (Mo. Ct. App. 2009). To hold otherwise would reward an insurer's "refusal to provide a defense by insulating it from a [bad faith failure to settle] claim." Id. at 210.

Because TIG *did* provide a defense to CF, the Shobe exception is inapplicable. Whether the Ganaway exception applies, however, is not as clear and depends on whether it was CF or the CF Trust that was required to make a settlement demand. If the CF Trust was the party obligated to make the demand,

_____

[28] Zurich claims that Defendants have ignored the holding of H & S Motor Freight. As a court sitting in diversity, I must determine how the Missouri Supreme Court would decide the issue. St. Paul Fire & Marine Ins. Co. v. Missouri United Sch. Ins. Council, 98 F.3d 343, 345 (8th Cir. 1996). To do so, I must first consider any pertinent decisions of the Missouri Supreme Court. Troknya v. Cleveland Chiropractic Clinic, 280 F.3d 1200, 1207 (8th Cir. 2002). If none are available, I must look to lower court decisions and other reliable state law authorities. Id. Just as I can only predict what Missouri law is regarding the necessity to make a demand, an opinion of a District Court is only a prediction.

the Ganaway exception does not apply because the CF Trust *was* advised of settlement offers. If CF was the party that must make the demand, Ganaway exception would apply because after CF was dissolved, CF could not have demanded that the Silva offers be accepted.

It is necessary then to determine whether the entity that was obligated to make the demand was CF or the CF Trust. The fact that CF, and not the CF Trust, was the named insured is not dispositive. Bonner, 899 S.W.2d at 927–28. In Bonner, the Missouri Court of Appeals determined that the person who had to make the settlement demand was the person against whom the claims were made, not the person to whom the insurance policy issued. Id. at 926, 928.

In this lawsuit, the USF&G policy was issued to CF, but the claims that were made against CF became claims against the CF bankruptcy estate. The CF Trust was created to hold all the assets of the old CF debtor companies and liquidate the bankrupt estates; it was established to manage the bankruptcy estate. Under the unique facts presented in this lawsuit, the CF Trust was the entity obligated to make a settlement demand because the Silva claims were made against the bankruptcy estate. Because the CF Trust elected not to demand that USF&G and TIG settle the Silva lawsuit, and the circumstances here do not

excuse the demand requirement, Defendants are entitled to judgment as a matter of law, even if Zurich could bring this lawsuit as an assignee or subrogee.

*Remaining issues*

Defendants also argue that they are entitled to judgment as a matter of law because Zurich cannot establish that the Silva lawsuit would have settled for an amount between $2 million and $3 million, which is the range Zurich's expert suggests was the reasonable settlement range, and because it is "beyond dispute" that an excess verdict implicating Zurich's policy was unlikely and the reasonable settlement value of the Silva lawsuit was less than the $5 million primary policy limit.

I have already determined that Defendants are entitled to judgment as a matter of law because Zurich cannot pursue this bad faith failure to settle lawsuit under principles of subrogation or via an assignment, and, even if Zurich could pursue this lawsuit, its claim fails as a matter of law because the CF Trust did not demand Defendants settle the Silva lawsuit. Because those conclusions dispose of this case, I will not address Defendants' additional arguments.

For the reasons stated above, I will grant judgment in favor of USF&G and TIG and against Zurich on all counts of Zurich's complaint and in favor of USF&G and against Zurich on USF&G's counterclaim for declaratory judgment.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant/Counterclaim-Plaintiff USF&G and Defendant TIG's motion for summary judgment [#164] is **GRANTED**.

Dated this 18th Day of February, 2010.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE