**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| AMERICAN GUARANTEE & LIABILITY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff/Counterclaim-Defendant, | ) ) | |
| v. | ) ) | Case No. 4:06-CV-00655-RWS |
| UNITED STATES FIDELITY & GUARANTY COMPANY, | ) ) ) | CONSOLIDATED |
| Defendant/Counterclaim-Plaintiff, | ) ) | |
| and | ) ) | |
| TIG INSURANCE COMPANY, | ) ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO ALTER
OR AMEND THE JUDGMENT PURSUANT TO FED.R.CIV.P. 59(e)**

Plaintiff American Guarantee & Liability Insurance Company ("Zurich") moves, pursuant to Fed.R.Civ.P. 59(e), to alter or amend the judgment entered in favor of defendants on February 18, 2010, so as to withdraw the grant of summary judgment to defendants and deny their summary judgment motion. We respectfully submit that the grant of summary judgment was the product of a number of manifest errors of fact and law, and the relief sought by this motion is necessary and appropriate to correct such errors and prevent a manifest injustice.

As discussed below, some of the errors relate to the Court's ruling that Zurich is not entitled to pursue its bad faith claim as a subrogee or assignee of Consolidated Freightways Corporation ("CF"), or under a direct duty theory, while others pertain to the ruling that Zurich's bad faith claim is foreclosed by the CF Trust's supposedly having failed to make a demand that the Silva case be

settled.  The discussion below is divided according to the above-referenced topics, with each of the claimed errors addressed under the appropriate topic.

### A.      ZURICH'S ABILITY TO MAINTAIN CLAIM

1.      The Court held that Zurich could not maintain its bad faith claim as a subrogee of CF, under principles of contractual or equitable subrogation, on the premise that "[i]f the interest of the insurer is derived by subrogation, the action must be brought by, or at least in the name of, the insured."  Memorandum and Order dated February 18, 2010 (Doc. No. 213, "Feb. 18 Order") at 24, quoting *Warren v. Kirwan*, 598 S.W.2d 598, 599 (Mo. Ct. App. 1980).  The Court erred as a matter of law in so holding – even assuming *arguendo* that *Warren* would preclude Zurich from maintaining this action in its own name in a Missouri state court[1] – in that, as discussed below, the question of in whose name an action must be brought is procedural, not substantive, and is governed by Fed.R.Civ.P. 17.  Rule 17(a)(1) provides that an action brought in federal court "must be prosecuted in the name of the real party in interest."  Here, only Zurich can be deemed the real party in interest.

In a diversity case such as this, the analysis of who is a real party in interest begins with an examination of "who, under governing substantive law, possesses the rights to be enforced." *Consul General of the Republic of Indonesia v. Bill's Rentals, Inc.*, 339 F.3d 1041, 1045 (8th Cir. 2003).  Such rights may reside in one who "legally, or equitably, own[s] the claim under the substantive law of the state."  *Rosenfeld v. Continental Bldg. Oper. Co.*, 135 F. Supp. 465, 467 (W.D. Mo. 1955). *See United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 380-81 (1949) (insurer-subrogee who has substantive equitable rights qualifies as real party in interest).

_____

[1] For the reasons discussed in § A.2, *infra*, we do not concede that *Warren* would preclude Zurich from maintaining this action in its own name in a Missouri state court.

619989.3

Missouri law, which this Court has held provides the substantive law governing this case, clearly recognizes principles of contractual and equitable subrogation.  There can be no dispute that under Missouri law, Zurich, as CF's excess insurer who paid $17 million to satisfy a judgment against its insured, holds at least equitable title to the bad faith claim asserted here.  *See* Plaintiff's Supplemental Brief Regarding Equitable Subrogation Under Missouri Law in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 204, "Zurich Supp. Subro. Br.").  Indeed, the Court appears to so recognize at pp. 23-24 of the Feb. 18 Order.

But the foregoing is not the endpoint of the analysis concerning how a claim may be brought, and by whom.  The complete analysis involves the separate and distinct question of in whose name the claim may be brought.  The party in whose name the action may be prosecuted is procedural, not substantive, and therefore is controlled by federal law as embodied in Fed.R.Civ.P. 17.  *See, e.g., Brocklesby Transport v. Eastern States Escort Services*, 904 F.2d 131, 133 (2d Cir. 1990); *Virginia Electric & Power Co. v. Westinghouse Electric Corp.*, 485 F.2d 78, 83 (4th Cir. 1973); *Gas Service Co. v. Hunt*, 183 F.2d 417, 419 (10th Cir. 1950); *Wattles v. Sears, Roebuck & Co.*, 82 F.R.D. 446, 450-451 (D. Neb. 1979).  Accordingly, to whatever extent Missouri law might provide that an action in state court must be brought in the name of the party holding legal title to the claim, here, where the action is brought in federal court, federal law, *i.e.,* Fed.R.Civ.P. 17, governs the procedural issue of in whose name the action may be brought.  As noted, Rule 17(a) requires that federal court actions must be brought in the name of the real party in interest, and that surely is Zurich under the circumstances of this case.

Numerous courts have endorsed the propriety of the foregoing analysis.  First, the U.S. Supreme Court did so in *United States v. Aetna Casualty & Surety Co.*, 338 U.S. at 380-81:

3

> Rule 17(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., which were specifically made applicable to Tort Claims litigation, provides that 'Every action shall be prosecuted in the name of the real party in interest,' and of course an insurer-subrogee, who has substantive equitable rights, qualifies as such.  If the subrogee has paid an entire loss suffered by the insured, it is the only real party in interest and must sue in its own name.  3 Moore, Federal Practice (2d Ed.) p. 1339.  If it has paid only part of the loss, both the insured and insurer (and other insurers, if any, who have also paid portions of the loss) have substantive rights against the tortfeasor which qualify them as real parties in interest.  (Footnote omitted).

The Supreme Court went on to note that "[u]nder the common law practice[,] rights acquired by subrogation could be enforced in an action at law, only in the name of the insured to the insurer's use," but stated, "[u]nder the Federal Rules, the 'use' practice is obviously unnecessary, as has long been true in equity."  338 U.S. at 381.

The principles underlying the foregoing analysis also have been endorsed by the Eighth Circuit.  *See National Garment Co. v. New York, C & St. L.R. Co.*, 173 F.2d 32 (8th Cir. 1949).  There, a garment company shipped a carload of knitting machinery which was damaged in transit, allegedly as a result of the carrier's negligence.  The garment company had purchased insurance, and the insurer paid part of the loss and thus became subrogated to the garment company's claim, to the extent of its payment.  The Eighth Circuit, after noting that Fed.R.Civ.P. 17 requires that every action be prosecuted in the name of the real party in interest, stated (173 F.2d at 34-35):

> In this situation there are two real parties in interest – the insurer to the extent of its payment and the insured to the extent of the difference between the payment received from the insurer and the whole loss.  In the absence of objection either may maintain an action against the person primarily liable, the insurer to the extent of its payment, the insured to the extent of the whole loss.  The rule against splitting a cause of action is for the benefit of the defendant and may be waived.  On objection by the defendant, the absent party should be made a party plaintiff.  (Internal citations omitted).

Numerous other cases have approved and followed the analysis set forth above, and inexorably lead to the conclusion that in this federal court action, Zurich is the real party in interest and a proper party to bring this case.  *See Ocean Ships, Inc. v. Stiles*, 315 F.3d 111, 116-17 (2d Cir.

619989.3

2002); *Brocklesby Transport v. Eastern States Escort Services*, 904 F.2d at 133; *Travelers Ins. Co. v. Riggs*, 671 F.2d 810, 812-14 (4th Cir. 1982); *Garcia v. Hall*, 624 F.2d 150, 152 (10th Cir. 1980); *Virginia Electric & Power Co. v. Westinghouse Electric Corp.*, 485 F.2d at 82-84; *Gas Service Co. v. Hunt*, 183 F.2d at 419-20; *Jossco Australia Party, Ltd. v. AG Processing, Inc.*, 2006 WL 4503895, *3 (D. Neb.); *Warner/Elektra/Atlantic Corp. v. Village of Bensenville, Illinois*, 1989 WL 91772, *2 (N.D. Ill); *Wattles v. Sears, Roebuck & Co.*, 82 F.R.D. at 448-49; *R.J. Reynolds Tobacco Co. v. Laney and Duke Storage Warehouse Co.*, 39 F.R.D. 607, 608 (M.D. Fla. 1966); *Hughey v. Aetna Cas. & Surety Co.*, 220 F.Supp 147, 147-48 (D. Del. 1963). *See generally*, Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1546.[2]

The purpose of requiring that an action be brought by the real party in interest is "to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata." *United Healthcare Corp. v. American Trade Ins. Co.*, 88 F.3d 563, 569 (8th Cir. 1996), quoting Fed.R.Civ.P. 17(a) Advisory Committee Note. As the Eighth Circuit stated in *Dubuque Stone Products Co. v. Fred L. Gray Co.*, 356 F.2d 718, 723 (8th Cir. 1966):

> If the judgment, if any, by the plaintiff will protect the defendant from future annoyance or loss, and where, as against the parties suing, the defendant can urge any defenses he could make against the real owner of the claim, then there is an end of the defendant's concern as to the protection he is afforded by having the claim prosecuted by the real party in interest. (Internal quotations and citations omitted).

Also, Rule 17 is "[i]ntended to expand the class of those who may sue to include persons having an equitable or beneficial interest." *Virginia Electric & Power Co.*, 485 F.2d at 83. It is not designed

---

[2] Defendants first raised the argument that "a party invoking the right to equitable subrogation must adhere to Missouri procedure, which Zurich has not done," in Defendants' Memorandum in Response to the Court's October 19, 2009 Order for Supplemental Briefing (Doc. No. 205) at 10. That memorandum was submitted as part of a supplemental round of briefing, in which the parties were directed to file simultaneous briefs. Accordingly, Zurich has not previously had an opportunity to brief the issues addressed above.

619989.3

to prevent prosecution of claims by persons having a legitimate stake therein, or spawn procedural wrangling "resulting in extravagant expenditures of time and effort before ever reaching the merits." *Id.*

Here, no one other than Zurich has an interest in the bad faith claim which is the subject of this case. There is no prospect that defendants will be subjected to any such claim by any other party in the future. Accordingly, there is no policy or practical reason why Zurich should not be permitted to pursue its bad faith claim in its own name, and every reason *to* permit Zurich's pursuit of the claim, consistent with the principles of Rule 17(a) that "[a]n action must be prosecuted in the name of the real party in interest."

2.      Even leaving aside the matters discussed in § 1 above, we submit that *Warren v. Kirwan, supra,* does not mandate the conclusion that Missouri state law precludes Zurich from pursuing its bad faith claims as a subrogee in its own name, and that the Court erred as a matter of law in concluding otherwise. First, *Warren* is distinguishable from the present controversy. It is not a case in which an insurer, being a real party in interest, was precluded from pursuing a claim. Rather, the Missouri Court of Appeals merely concluded that the plaintiff-insured was a real party in interest and his failure to join his insurer in the action was a nonjoinder, which did not necessarily require dismissal of the action. 598 S.W.2d at 601.

Moreover, numerous courts in Missouri, both state and federal, have allowed analogous cases to be pursued by an insurer in its own name. *See West Am. Ins. Co. v. RLI Ins. Co.,* 2008 WL 1820839 (W.D. Mo.); *Central Nat'l Ins. Co. of Omaha v. Med. Protective Co. of Fort Wayne, Ind.,* 107 F.R.D. 393 (E.D. Mo. 1985); *Johnson v. Allstate Ins. Co.,* 262 S.W.3d 655 (Mo. Ct. App. 2008); *Freeman v. Basso,* 128 S.W.3d 138 (Mo. Ct. App. 2004); *Bonner v. Auto. Club Inter-Ins. Exch.,* 899 S.W.2d 925 (Mo. Ct. App. 1995); *Ganaway v. Shelter Mut. Ins. Co.,* 795 S.W.2d 554,

619989.3

564-65 (Mo. Ct. App. 1990).  Also, allowing Zurich to prosecute its bad faith claim in its own name

is consistent with the practice prevailing in nearly all of the many other jurisdictions which have

considered the issue.  *See* Zurich Supp. Subro. Br. at 6-9.  It is inconceivable that the Missouri

Supreme Court would hold that Zurich may not pursue its bad faith claim in its own name under the

circumstances of this case.

A recent decision from the U.S. District Court for the Western District of Missouri, rendered

October 8, 2009, is instructive.  *West Am. Ins. Co. v. RLI Ins. Co.*, 2009 WL 3327203 (W.D. Mo.).

There, the defendant in a bad faith action claimed that the plaintiff excess insurer was not a real party

in interest because the insurer did not pay the entire judgment against the insured.  *Id.* at *3.  The

controversy was governed by Kansas law, and the defendant pointed to a Kansas case holding that

"[w]hen the [insured's] loss has been only partially satisfied by insurance, the insured is a proper

party to bring suit for the deficiency," *Thompson v. James*, 597 P.2d 259 (Kan. App. 1979).  *Id.*  The

court rejected defendant's argument, stating:

> Under West American's logic, however, an excess insurer could *never* be the real
> party in interest in a bad faith action against a primary insurer because an excess
> insurer would never pay the insured's "[t]otal loss."  The Court does not believe
> Kansas courts would apply *Thompson* to a situation such as here, where an excess
> insurer has sued a primary insurer for bad faith.  (Emphasis in original).

3.      Separate and apart from the matters addressed in the preceding two sections regarding

subrogation, the Court also erred as a matter of law in concluding that Zurich cannot be deemed

entitled to pursue its bad faith claim as an assignee of CF.  The Court noted that the Zurich/CF

excess insurance policy transferred CF's rights of recovery on a bad faith claim to Zurich, and that

Zurich thus could be deemed entitled to pursue its bad faith claim as an assignee of CF, if the claim

was assignable.  Feb. 18 Order at 23-25.  However, the Court held that *Quick v. Nat'l Auto Credit*,

65 F.3d 741 (8th Cir. 1995), compelled it to conclude that a bad faith claim is not assignable.  Feb. 18

Order at 27-29.

619989.3

As a starting point, *Quick* involved circumstances in which a defendant in a personal injury action assigned to the personal injury plaintiff the defendant's bad faith claim against the defendant's insurer. Moreover, the claim assigned in *Quick* was for unliquidated amounts, and ultimately resulted in a verdict for $6.5 million in actual damages and $885,000 in punitive damages. These circumstances give rise to substantially different public policy concerns than those implicated by the present case. *See* Zurich Supp. Subro. Br. at 9-13. Accordingly, a decision to disallow the kind of assignment involved in *Quick* does not mandate the conclusion that a corporate insured may not validly assign to its excess insurer a bad faith claim arising from the excess insurer having paid a judgment against the insured.

Further, *Quick* was decided in 1995, and since then, assignments of bad faith claims have been allowed to form the basis for recovery in a number of Missouri state and federal cases. *See* cases cited at pp. 6-7, *supra*. Also, with respect to the many other jurisdictions which have considered whether bad faith claims of the kind involved here are assignable, almost all of them have held in the affirmative. *See* Zurich Supp. Subro. Br. at 7-9.

Where a question of state law arises on which there is no controlling Missouri Supreme Court precedent, this Court's charge is to determine how the Missouri Supreme Court would decide the issue, looking for guidance to Missouri lower court decisions and other reliable state law authorities. The Court recognized these guiding principles, *see* Feb. 18 Order at 31 n. 28, but erred in their application. When it confronted the issue of assignability of the bad faith claim involved here, the Court was doing so 14 years after the decision in *Quick*, against a different legal backdrop than existed at the time *Quick* was decided. Moreover, this Court was called upon to consider the issue in a very different factual context from that involved in *Quick*. In light of all the facts and circumstances of this case, and the present legal landscape, in Missouri and elsewhere, it is

619989.3

inconceivable that the Missouri Supreme Court would hold that Zurich does not have the right and ability to pursue its bad faith claim as an assignee of CF. The Court should have so concluded after undertaking a fresh analysis of the issue in the present context, but instead deemed itself bound to apply the conclusion of non-assignability found in *Quick*. In so doing, the Court erred as a matter of law.

     4.     Leaving aside the points discussed in the preceding sections, and even assuming *arguendo* that Zurich is not entitled to maintain this action in its own name, but rather must bring the action in the name of its insured, the Court nonetheless erred in granting summary judgment against Zurich on that basis, as opposed to affording Zurich an opportunity to amend its pleadings or join additional parties.

     That conclusion is mandated, first of all, by the plain language of Fed.R.Civ.P. 17(a)(3), which provides:

> The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

Consistent with that language, a number of cases have held that the proper approach, in the event an action is brought by the wrong party, or in the wrong name, is to allow the defect to be remedied and the action to proceed. *See, e.g., Jaramillo v. Burkhart*, 999 F.2d 1241, 1246 (8th Cir. 1993); *Mecklenburg Farm, Inc. v. Anheuser-Busch, Inc.*, 250 F.R.D. 414, 418 (E.D. Mo. 2008); *Jossco Australia Party, Ltd. v. AG Processing, Inc.*, 2006 WL 4503895 at *3-5; *Rosenfeld v. Cont'l Bldg. Oper. Co.,* 135 F.Supp. at 470.[3]

_____

[3] Even in the most extreme circumstances, the remedy for an action being brought by the wrong party, or in the wrong name, should be not a judgment on the merits but rather, at most, a dismissal without prejudice, thus allowing a new action to be pursued by the proper party, or even

If there is any requirement that this action be brought by or in the name of Zurich's insured, CF – which, for the reasons discussed previously, we dispute – that requirement can be satisfied by allowing Zurich to amend its pleadings to reflect that it is bringing this action in the name of CF, for the use and benefit of Zurich. *See, e.g., Holyoke Mut. Ins. Co. v Concrete Equipment Co.*, 394 So.2d 193, 196-97 (Fla. App. 1981). *Holyoke* involved circumstances analogous to this case, including an insured which had been dissolved.  The court held that the insurer had the right to maintain the action either in its own name, or in the name of the insured for the use and benefit of the insurer. *Id*. Accordingly, at the very least, Zurich should be afforded an opportunity to remedy the perceived deficiency, rather than having an adverse judgment entered.[4]

5.　As a final and alternative argument to the points discussed above, we submit that the Court erred in concluding, "Zurich recognizes that USF&G and TIG owed it no direct duty of good faith . . . ." Feb. 18 Order at 22.  To the contrary, Zurich maintains that if for any reason, it is not deemed to have a viable remedy in this case under principles of subrogation or assignment, the Court should recognize, under the unique and limited circumstances of this case, duties of good faith

---

the same party in the name of another. *See, e.g., Rosenfeld v. Cont'l. Bldg. Oper. Co.,* 135 F.Supp. at 470.

[4] In addition to the matters discussed above, defendants can be deemed to have waived, or otherwise failed to properly raise, their argument that Zurich has not adhered to Missouri procedure. As noted previously, defendants first raised that argument in a supplemental brief requested by the Court after briefing otherwise had been completed.  Summary judgment cannot properly be sought, or granted, based on an argument first raised in a reply brief – at least where the opposing party has not been given an opportunity to respond. *See, e.g., Doebele v. Sprint/United Mgmt. Co.,* 342 F.3d 1117, 1139 N. 13 (10th Cir. 2003); *Provenz v. Miller,* 102 F.3d 1478, 1483 (9th Cir. 1996). It follows that defendants cannot claim entitlement to summary judgment on grounds first asserted in a supplemental brief post-dating the filing of their reply.  Also, a number of cases have held that an objection that the action has not been brought by the real party in interest should be raised in the trial court with reasonable promptness and, absent that, will be deemed waived.  *See, e.g., United Healthcare Corp. v. American Trade Ins. Co.,* 88 F.3d at 569; *Sun Refining and Marketing Co. v. Goldstein Oil Co.,* 801 F.2d 343, 345 (8th Cir. 1986); *Chicago and Northwestern Transp. Co. v. Negus-Sweenie, Inc.,* 549 F.2d 47, 49-50 (8th Cir. 1977).

619989.3

flowing directly from defendants to Zurich. *See* Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 181, "Zurich S.J. Opp.") at 26-31.

Zurich acknowledges that many states, including Missouri, have not to-date recognized such a direct duty. However, many of those cases turn on the availability of subrogation as a remedy, and do not exclude the possibility that in appropriate circumstances, where subrogation does not provide a remedy, a direct duty may be recognized. *See* Zurich S.J. Opp. at 27-31.

Again, if Zurich's claim under principles of subrogation or assignment is deemed to fail for any reason – including that the action has not been brought in the name of the proper party, or the lack of a demand by the insured that the underlying case be settled[5] – we maintain that under the unique and limited facts and circumstances of this case, Missouri courts would recognize direct duties of good faith flowing from defendants to Zurich. *Id*. We submit that the Court erred as a matter of law in failing to accept that argument and, indeed, failing to even consider it.

**B.      DEMAND-RELATED ISSUES**

1.      The Court held that there are two circumstances in which a demand by the insured that the underlying case be settled is not an essential element of a claim for bad faith refusal to settle: (1) where the insurer has failed to notify the insured of a settlement offer, citing *Ganaway v. Shelter Mut. Ins. Co.*, 795 S.W.2d 554, 564 (Mo. Ct. App.1990); and (2) where an insurer refuses to provide a defense to the insured, citing *Shobe v. Kelly*, 279 S.W.3d 203, 211 (Mo. Ct. App. 2009). The Court concluded that the *Shobe* exception does not apply here since TIG did provide a defense, and

---

[5] In a claim grounded in subrogation, the subrogee is subject to defenses assertable against the subrogor, including, in cases where a demand is a necessary element of a bad faith claim, that the insured failed to make a demand for settlement. In contrast, where a bad faith claim rests on a theory of direct duty flowing from a primary to an excess insurer, the focus is on what transpired between the insurers, and whether the insured made a demand for settlement is irrelevant. *See, e.g., Commercial Union Ins. Co. v. Medical Protective Co.*, 393 N.W.2d 479, 484 (Mich. 1986).

619989.3

that whether the *Ganaway* exception applies depends on whether the demand needed to come from CF, on the one hand, or the CF Trust, on the other.  *See* Feb. 18 Order at 31-32.

In the latter regard, the Court held that if the CF Trust was the proper party to make a settlement demand, the *Ganaway* exception would not apply because the CF Trust *was* advised of settlement offers, whereas if CF was the proper party to make the demand, no demand would be necessary because CF could not have made a settlement demand after it was dissolved.  *Id*.  The Court ultimately held that the demand needed to come from the CF Trust because the Silva claims were asserted against CF's bankruptcy estate and the Trust was, in essence, CF's bankruptcy estate. On that basis, the Court held that Zurich's claim must fail for lack of a demand.  *Id.* at 32-33.

In the foregoing analysis, the Court  erred, first of all, in concluding that a settlement demand needed to come from the CF Trust, as opposed to CF, on the premise that the CF Trust was the target of the Silva claims.  That conclusion overlooks certain aspects of the undisputed factual record as well as certain bankruptcy law principles.

As to the factual record, it is undisputed that as a condition for obtaining relief from the automatic stay of proceedings imposed under bankruptcy law, and thus being allowed to pursue their state court actions, the Silva plaintiffs stipulated that any recovery would be limited to "any applicable insurance coverage the Debtors may have . . . ."  *See* Plaintiff's Response to Defendants' Revised Statement of Uncontroverted Facts (Doc. No. 180, "Plaintiff's Factual Response") at ¶ 45. Accordingly, it cannot be said that CF was the target of the Silva claims.  CF had no exposure for any recovery.  Similarly, CF's bankruptcy estate was not the  target of the Silva claims, as it had no potential exposure.  The only target of the Silva claims was CF's insurance policies.

Moreover, even leaving aside that CF was not the target of the Silva claims – which means that CF's bankruptcy estate similarly cannot be viewed as the target of the Silva claims – the Court

619989.3

further erred as a matter of law in equating the CF Trust with CF's bankruptcy estate.  When CF filed its bankruptcy petition in 2002, a bankruptcy estate was automatically created under 11 U.S.C. § 541, consisting of CF's legal and equitable property interests as of the bankruptcy filing date. 11 U.S.C. § 541(a)(1). *See* Plaintiff's Factual Response, Zurich's Statement of Additional Material Facts ("Zurich's SAMF") at ¶ 24.  In contrast, the CF Trust did not come into being until December 2004, more than two years later.  It was created not by statute, but rather pursuant to CF's confirmed plan of liquidation and a Liquidation Trust Agreement ("LTA").  *See* Zurich's SAMF at ¶¶ 26, 28; Zurich Exhibit 48, Liquidation Trust Agreement.

The CF Trust is a liquidating entity into which only certain assets, existing as of a certain date, were transferred.  Zurich Ex. 48; *See* Plaintiff's Supplemental Brief Regarding Bankruptcy Issues in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 207, "Zurich Supp. Bkcy. Br.") at 4.  The trustee of the CF Trust and others, such as the Oversight Committee, were given defined rights, interests and powers relating to the liquidation of the transferred assets and distribution of the proceeds to CF's creditors.  *See* Zurich's SAMF at ¶¶ 28-29.  Accordingly, the notion that the CF Trust is the equivalent of CF and its bankruptcy estate, and was the target of the Silva claims, is an erroneous premise.  Once that premise is removed from the Court's analysis, the logical underpinning for the conclusion that a demand for settlement needed to come from the CF Trust falls away.

2.      Even  assuming *arguendo* that, notwithstanding the foregoing, the CF Trust was the appropriate party to make a demand that the Silva claims be settled, the Court further erred in holding that the *Ganaway* exception was inapplicable on the premise that the CF Trust was advised of settlement offers.  While there is evidence that CF Trust personnel were apprised of the $5 million settlement demand made by the Silva plaintiffs in December 2005, there is no evidence that

619989.3

defendants made any effort whatsoever to keep the CF Trust apprised of settlement communications that occurred later, including TIG's settlement offer of $500,000 on the first day of trial, the Silva plaintiffs' counter-offer to settle for $4.75 million, the Silva plaintiffs' willingness to entertain a high-low proposal, TIG's ensuing $2 million/$250,000 high-low proposal, and the Silva plaintiffs' rejection of the high-low proposal, accompanied by a statement that their offer to settle for $4.75 million remained on the table.[6]

Indeed, other than what the CF Trust may have learned from Zurich or Brad Baumgart, TIG largely kept CF and the CF Trust in the dark as to what was transpiring with respect to settlement negotiations.  For example, neither CF nor the CF Trust was aware of the Silva plaintiffs' $20 million settlement demand in 2003, or participated in the 2004 mediation.  *See* Zurich's SAMF at ¶¶ 47, 70.  Moreover, it is undisputed that TIG did not share the amounts of any of the settlement offers during the Silva trial with the CF Trust.  *Id.* at ¶ 246.   TIG's claim notes, which are supposed to document any discussions between TIG and the CF Trust concerning the status of the Silva trial or settlement negotiations, make no mention of any effort by TIG to keep the CF Trust apprised of any developments during the trial, either positive or negative, or the status of settlement negotiations with the Silva plaintiffs.  *Id.* at ¶¶ 201, 257.

Implicit in the reasoning of *Ganaway* is that, if an insured is going to be required to make a demand for settlement as a condition of preserving a bad faith claim, the insured and its insurer (directly or through counsel) will be consulting all along the way about settlement.  Presumably, the

_____

[6]  In Defendants' Revised Statement of Uncontroverted Material Facts (Doc. No. 174, "Defendants' SUMF"), defendants assert many facts related to developments during the case that impacted settlement negotiations, as well as the actual settlement negotiations between TIG and the Silva plaintiffs, but make no mention of CF or the CF Trust being involved in or even being made aware of such developments or negotiations, *e.g.*, the 2004 mediation (¶¶ 58-66), TIG's November 2005 assessment of the Silva case (¶¶ 86-92), Lawder's final pretrial assessment (¶¶ 108-116), TIG's internal assessment (¶¶ 117-128), settlement negotiations at trial (¶¶ 148-156), and settlement discussions related to a high-low proposal (¶¶ 189-191).

insured will be kept in the loop on settlement considerations such that, at any point in time, the insured is fully informed and has a proper factual basis for evaluating whether it wishes to pressure its insurer to settle the case.  Here, the summary judgment record wholly fails to establish that these types of communications occurred with the CF Trust, especially once the trial started.

In sum, on the summary judgment record, there was no proper basis for concluding that this case does not come within the facts and reasoning of *Ganaway*, so as to obviate any requirement of a demand for settlement as a prerequisite to a bad faith claim.  To the contrary, under the undisputed facts of this case, it is clear that defendants did not at all pertinent times keep the CF Trust apprised of all settlement offers and counter-offers.  Accordingly, as a matter of law, under *Ganaway*, a demand by the CF Trust that defendants settle the Silva claims cannot properly be viewed as a prerequisite to a bad faith claim by Zurich.

3.      A further flaw in the Court's conclusion that a settlement demand by the CF Trust is an essential element of Zurich's bad faith claim is that the CF Trust lacked authority to make settlement decisions for claims like the Silva claims.  The Court noted Zurich's contention in that regard but overlooked the relevant facts and legal principles.  For instance, the Court apparently concluded that requisite settlement authority appears in § 3(a)(21) of the LTA, which empowers the trustee to institute all claims and causes of action which could be brought by a trustee or debtor in possession.  *See* Feb. 18 Order at 13.  In so concluding, however, the Court overlooked the fact that § 3 of the LTA, which governs the duties and powers of the trustee, addresses only the Trust's right to pursue affirmative claims, and says nothing about defending or settling claims asserted *against* CF.[7]

---

[7] Section 3(a)(24) of the LTA gives the trustee the authority to "settle, compromise or adjust, by arbitration or otherwise, any Claims or any disputes or controversies in favor of or against the

Further, the Court overlooked language in the LTA providing that the trustee, without approval of the Oversight Committee, lacks authority to make decisions concerning "any determination to defend or prosecute any litigation in lieu of settlement where the amount in litigation or the amount of the Claim exceeds $50,000." *See* Zurich's SAMF at 29; Zurich Ex. 48, at § 3(c)(10). The summary judgment record contains no evidence of involvement of the Oversight Committee in the Silva case, in which the amount in controversy far exceeded $50,000. Under Missouri law, a demand is not a required element of a bad faith claim in circumstances where, as here, the insured cannot have been reasonably expected to make a demand. *See Shobe v. Kelly*, 279 S.W.3d at 210.

4.     Apart from the foregoing points, the Court further erred in holding that the factual scenarios involved in *Shobe* and *Ganaway* are the only circumstances under Missouri law in which a demand for settlement by the insured is not an essential element of a bad faith claim. The Court's conclusion reflects an unduly narrow reading of *Shobe*, *Ganaway* and other case law, including *H&S Motor Freight, Inc. v. Truck Insurance Exchange*, which held that a settlement demand by the insured is not an essential element of a bad faith claim under Missouri law. 540 F.Supp. 766, 768-69 (W.D. Mo. 1982).

There is a broader lesson to be drawn from those cases, which is that a demand for settlement should not be deemed an essential element of a bad faith claim whenever the facts of the case are such that a demand would not be reasonably expected. That is precisely the case here. While the Silva case was pending, the CF Trust did not view itself as having any financial stake in whether those claims were settled, or for how much. Kerry Morgan, the trustee of the CF Trust, concluded

---

Trust." Zurich Ex. 48.  This section does not mention claims made against CF, only those made against the CF Trust.  Accordingly, it is inapplicable to the Silva claims, which were asserted against CF, not the CF Trust.

619989.3

that the Silva case was an insurance matter, with it being up to TIG to make settlement decisions. *See* Zurich's SAMF at ¶¶ 37, 112-13, 227-28.  Accordingly, it makes no sense to require a settlement demand by the CF Trust as a condition of allowing Zurich to pursue a bad faith claim.

We note that this is not a case in which the CF Trust communicated to defendants that, for some reason, it did not want the Silva claims to be settled.  To the contrary, CF Trust personnel made clear that they hoped and expected the case would be settled.  *See* Zurich's SAMF at ¶¶ 230, 233, 247.   Accordingly, this case is readily distinguishable from cases in which a bad faith claim was deemed foreclosed because the insured affirmatively made clear that it did not want the insurer to settle the claims.  *See, e.g., Westchester Fire Ins. Co. v. Gen. Star Indem. Co.*, 183 F.3d 578, 583 (7th Cir. 1999) (holding that an insurer cannot rely on the "consent defense" to a bad faith claim when the insured's consent was "not unequivocal"); *Am. States Ins. Co. v. State Farm Mut. Automobile Ins. Co.*, 6 F.3d 549, 551 (8th Cir. 1993); *Certain Underwriters of Lloyd's v. Gen. Accident Ins. Co.*, 909 F.2d 228, 234 (7th Cir. 1990).

5.     Leaving aside the issues of who was the appropriate party to make a demand, and whether a demand was even necessary under Missouri law, the Court erred in concluding that the CF Trust did not make any sort of demand or request for settlement sufficient to satisfy any requirement of a demand for settlement applicable here.  The Court ignored a plethora of facts, set forth in both Zurich's responses to defendants' factual assertions and its statement of additional material facts, establishing that CF Trust personnel communicated to TIG that they hoped, expected and desired that the Silva case be settled and, further, that TIG had confirmed to the CF Trust that it fully intended to settle the Silva case at or before trial, thus rendering a further settlement demand by the CF Trust unnecessary.

619989.3

We point, first, to testimony of Kim Mingo, who attended the first week of the Silva trial. Defendants did not dispute her testimony that she, Tammy Burris and Kerry Morgan all "wanted" the Silva case to be settled, and "hoped" that it would be settled.  *See* Defendants' Reply and Response to the Statements of Material Facts in Support of and in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 187, "Defendants' Factual Reply") at ¶ 230.   Likewise, defendants did not dispute Mingo's testimony that, during a conference call with Dove, she, Burris and Morgan told her that they "hoped that the Silva claims would be settled." *Id.* at ¶ 233. Defendants also did not dispute Mingo's testimony that, even though she "wanted" the Silva case to be resolved or settled, she understood that only TIG controlled settlement, and she "firmly believed" that TIG would settle the case. *Id.* at ¶ 247.

Also significant is deposition testimony of each of Mingo, Morgan and Burris, offered by Zurich in support of the uncontroverted proposition that neither CF nor the CF Trust ever told TIG or USF&G that it did not want the Silva case to settle, or otherwise attempted to discourage them from settling the Silva case. *Id.* at ¶¶ 253-55.  Of further significance is deposition testimony of Morgan and Burris making clear that the CF Trust's decision not to send a written demand was driven not by a determination that the Silva case should not be settled within policy limits, but rather by the fact that such a demand was an "unnecessary act," because TIG had already confirmed to the CF Trust that it intended to settle the Silva case and, therefore, putting a settlement demand in writing would be tantamount to demanding that TIG do what it was already doing.[8]  *See* Plaintiff's Factual Response at ¶¶ 160-61 (citing Burris's testimony at pp. 123-25); Zurich's SAMF at 114, 234-38, 243

---

[8]  In its Order, the Court takes issue with Zurich's supposedly disputing the fact that the CF Trust did not ever make a request or demand to TIG that it settle the Silva case for $5 million.  *See* Feb. 18 Order at 15, n. 16.  However, that is not the fact Zurich disputed.  Defendants never offered any such factual assertion in their 202 statements of allegedly uncontroverted material facts.  Instead, defendants offered the broader and different proposition that the CF Trust refused to make a written

619989.3

(citing Morgan's testimony at pp. 102, 117-19, 123).[9]

In sum, the Court's Order is flawed to the extent it rests on a conclusion that the CF Trust did not make any sort of demand or request for settlement sufficient to satisfy any requirement of a demand in the context of this case.[10]

## CONCLUSION

For all of the foregoing reasons, we respectfully submit that the Order granting summary judgment in favor of defendants should be altered or amended to withdraw the grant of summary judgment and provide that defendants' summary judgment motion must be denied.

---

demand that TIG settle the case within policy limits. *See* Defendants' Revised SUMF at ¶¶158-160. Defendants offered the cited testimony of Morgan in support of that proposition, but the testimony cited does not necessarily support defendants' factual assertion, since a failure to demand that TIG pay $5 million to settle the Silva case does not necessarily connote the lack of a demand that TIG settle the case for some lesser amount that the Silva plaintiffs may be willing to accept.

[9] A further error concerning demand-related issues involves the Court's failure to consider Zurich's argument concerning direct duty, as addressed in § A, note 5, *supra*. As discussed in note 5, if direct duties flowing from defendants to Zurich are recognized under the unique and limited circumstances of this case, any lack of a demand for settlement by the insured is irrelevant and not an obstacle to Zurich's bad faith claim.

[10] The Court's Order reflects other errors as well, which less directly account for the grant of summary judgment against Zurich on the dual grounds relied on by the Court, so are not addressed above. For instance, the Court's discussion at pp. 8-10 of the Feb. 18 Order, culminating in the conclusion that "[t]he record does not support Zurich's assertion that the fronting aspect of [the] policy was terminated by CF's bankruptcy" (p. 10), misperceives the thrust of Zurich's position. What Zurich argued was that, upon CF's bankruptcy, CF's administration and payment of claims on a front-line basis ceased, and defendants began handling and paying claims in the same manner as an insurer would under a traditional insurance policy not embodying a fronting arrangement. Further, the Court stated, at p. 9 of its Feb. 18 Order, that "there is evidence that USF&G used the collateral posted in association with the indemnity agreement to pay on claims against CF . . . ." It certainly cannot properly be concluded that the facts are undisputed in that regard. There is record evidence that in the CF bankruptcy proceedings, USF&G asserted a claim under the Indemnity Agreement for the full amount of the approximately $115,000,000 in claims paid or reserved under the CF policies, without any credit or reduction for the $87 million in collateral it received upon CF filing for bankruptcy. *See* Zurich's SAMF ¶ 262. These facts certainly undermine any notion that USF&G was paying claims out of the collateral, rather than out of its pocket. Moreover, at the time the Silva claims were being handled, TIG (through its affiliate nSpire Re, Ltd.) was the responsible insurer by virtue of the Loss Portfolio Transfer Agreement ("LPT") and was paying claims out of its pocket. *See* Zurich's SAMF ¶¶ 54-57. There certainly are no undisputed facts establishing that, in 2005-06, under the TIG regime, claim payments were coming from the collateral. Indeed, the factual record in that regard is not fully fleshed out at all, Zurich having been denied an opportunity to delve into those facts in the course of discovery.

619989.3

Respectfully submitted,

SPENCER FANE BRITT & BROWNE LLP

By:        /s/ Gerald P. Greiman
Gerald P. Greiman, #3276
ggreiman@spencerfane.com
Erik O. Solverud, #61269
esolverud@spencerfane.com
Anne M. Lindner, #533403
alindner@spencerfane.com
1 N. Brentwood Blvd., Suite 1000
St. Louis, MO 63105
Telephone (314) 863-7733
Facsimile (314) 862-4656

*Attorneys for Plaintiff*

619989.3

## CERTIFICATE OF SERVICE

I hereby certify that on March __17__, 2010, *Plaintiff's Memorandum in Support of Motion to Alter or Amend the Judgment Pursuant to Fed.R.Civ.P. 59(e)* was filed electronically with the Clerk of the Court, to be served by operation of the Court's electronic filing system upon the following attorneys of record:

CARMODY MacDONALD P.C.
Gerard T. Carmody
David H. Luce
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
(314) 854-8600 (Telephone)
(314) 854-8660 (Fax)
*gtc@carmodymacdonald.com*
*dhl@carmodymacdonald.com*

THOMPSON, LOSS & JUDGE, LLP
Peter G. Thompson
Thomas J. Judge
Two Lafayette Centre
1133 21st Street, N.W., Suite 450
Washington, D.C. 20036
(202) 778-4060 (Telephone)
(202) 778-4099 (Fax)
*pthompson@tljlaw.com*
*tjudge@tljlaw.com*

Jack T. Friedman
Carroll, Burdick & McDonough, LLP
1676 N. California Blvd., Suite 620
Walnut Creek, CA 94596
(925) 944-6080 (Telephone)
(925) 256-3110 (Fax)
*jfriedman@cbmlaw.com*

*Attorneys for Defendants United States Fidelity &*
*Guaranty Company and TIG Insurance Company*

/s/Gerald P. Greiman

619989.3